**UNITED STATES of America,
Plaintiff,**

v.

**1) Barry Byron MILLS; 2) Tyler Davis Bingham, Defendants.**

**No. CR02–938(E)DOC.**

United States District Court,
C.D. California.

Aug. 17, 2006.

Gregory W. Jessner, U.S. Attorneys, Los Angeles, CA, for Plaintiff.

Mark F. Fleming, Mark F. Fleming Law Offices, San Diego, CA, H. Dean Steward, H. Dean Steward Law Offices, San Clemente, CA, for Defendants.

### *ORDER* RE: PENALTY PHASE PROCEDURES

CARTER, District Judge.

Before the Court are two issues concerning the procedures of the death penalty phase of the Aryan Brotherhood trial: (1) whether the Confrontation Clause of the Sixth Amendment applies during the penalty phase of a capital trial; and (2) whether proof of unadjudicated crimes, when offered as evidence to prove the alleged non-statutory aggravating factor of future dangerousness, should be subject to an independent burden of proof. After considering extensive written and oral argument submitted by the parties, for the

reasons set forth below, the Court hereby makes final its tentative rulings that: (1) Testimonial hearsay offered to prove statutory and non-statutory aggravating factors in the death penalty selection phase is barred by the Confrontation Clause; and (2) unadjudicated criminal acts offered to prove the non-statutory aggravating factor of future dangerousness are not subject to an independent burden of proof.

## I. BACKGROUND

On July 29, 2006, a jury rendered guilty verdicts to Counts Six and Seven of the First Superseding Indictment against Defendants Barry Byron Mills and Tyler Davis Bingham. Counts Six and Seven each allege that the defendants committed a violent crime in aid of racketeering ("VICAR"), namely the murders of Frank Joyner and Abdul Salaam at the United States Penitentiary ("USP") in Lewisburg, Pennsylvania in 1997. *See* 18 U.S.C. § 1959(a)(1). VICAR murder is a capital offense. *Id.* The government now seeks the death penalty against Defendants Mills and Bingham.

At a status conference held during the jury's deliberations in the guilt phase, the Court requested that the government provide an overview of the evidence it intends to present during the penalty phase of the trial, should a guilty verdict ensue. The government presented to the Court several hundred pages of documents regarding each defendant. These documents are mostly prison documents and pre- and post-sentence reports. Within these documents are numerous allegations of misconduct against Defendants, including acts ranging in severity from delaying a bed

count or flooding one's cell to never-prosecuted acts of murder. The government indicated that, at that time, it intended to prove the non-statutory factor of future dangerousness primarily through those documentary sources and that it expected to call few live witnesses.

The government contends that the right of confrontation does not apply to evidence of aggravating factors that can subject a capital defendant to the death penalty. This view sanctions the admission of, for example, hearsay evidence from uncorroborated, unnamed informants, presented to the jury in a sterilized document, in order to prove uncharged crimes allegedly committed decades ago. The Court rejects this view, holding that the Confrontation Clause forbids the admission of testimonial hearsay during the death penalty phase.

## II. The Federal Death Penalty Act

■ The Federal Death Penalty Act ("Act" or "FDPA"), 18 U.S.C. §§ 3591, et seq., sets forth the procedures for the penalty phase of a capital trial in federal court. It requires the jury, and not the judge, to engage in a six-step sentencing procedure and make the following determinations: (1) that the statutory intent factor has been proven beyond a reasonable doubt, *id.* § 3591(a)(2); (2) that at least one statutory aggravating facto has been established beyond a reasonable doubt, *id.* § 3593(c), (d); (3) that any additional statutory factors have been established beyond a reasonable doubt, *id.* § 3593(c); (4) that any non-statutory aggravating factor[1] has been established beyond a reasonable doubt, *id.;* (5) whether any single juror has found a mitigating factor by prepon-

---

**1.** "The term 'nonstatutory aggravating factor' is used to refer to any aggravating factor that is not specifically described in 18 U.S.C. § 3592. Section 3592(c) provides that the jury may consider 'whether any other aggra- vating factor for which notice has been given exists.'" *Jones v. United States,* 527 U.S. 373, 378 n. 2, 119 S.Ct. 2090, 144 L.Ed.2d 370 (1999).

derance of the evidence, *id.;* and (6) "whether all the aggravating factor or factors found to exist sufficiently outweigh all the mitigating factor or factors found to exist to justify a sentence of death, or, in the absence of a mitigating factor, whether the aggravating factor or factors alone are sufficient to justify a sentence of death," *id.* § 3593(e). Under this procedure, the FDPA empowers the jury with the ultimate decision about whether to impose the death penalty. Thus, the statutory procedure differs from non-capital sentencing, which is conducted by the judge. The jury makes this ultimate decision only after engaging in this highly structured process.

■ This six-step procedure comprises both the "eligibility phase" and "selection phase" of death penalty procedure. *E.g., Tuilaepa v. California,* 512 U.S. 967, 971, 114 S.Ct. 2630, 129 L.Ed.2d 750 (1994). These two phases ensure that the procedure "rationally narrow[s] the class of death-eligible defendants" and permit the jury to "render a reasoned, individualized sentencing determination based on a death-eligible defendant's record, personal characteristics, and the circumstances of his crime." *Kansas v. Marsh,* —— U.S. ——, 126 S.Ct. 2516, 2524–25, 165 L.Ed.2d 429 (2006). The Supreme Court has devised this two-phased procedure in recognition of the need for heightened reliability in death penalty proceedings. *See Murray v. Giarratano,* 492 U.S. 1, 8–9, 109 S.Ct. 2765, 106 L.Ed.2d 1 (1989) (recognizing that "[t]he finality of the death penalty requires 'a greater degree of reliability' when it is imposed" (quoting *Lockett v. Ohio,* 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978))); *Woodson v. North Carolina,* 428 U.S. 280, 305, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976) (plurality opinion) (recognizing that "the penalty of death is qualitatively different" from all other forms of punishment).

■ The first two steps comprise the eligibility phase: Upon finding the intent factor and one statutory aggravating factor, a defendant becomes "eligible" for the death penalty. Eligibility requires that "the defendant must be convicted of a crime for which the death penalty is a proportionate punishment." *Tuilaepa,* 512 U.S. at 971, 114 S.Ct. 2630. "The eligibility decision fits the crime within a defined classification. Eligibility factors almost of necessity require an answer to a question with a factual nexus to the crime or the defendant so as to 'make rationally reviewable the process for imposing a sentence of death.'" *Id.* at 973, 114 S.Ct. 2630.

■■ The final four steps of the FDPA comprise the "selection phase," where the jury must decide "whether he should receive a death sentence." *Jones,* 527 U.S. at 377, 119 S.Ct. 2090. Unlike the eligibility phase, the selection phase "requires individualized sentencing and must be expansive enough to accommodate relevant mitigating evidence so as to assure an assessment of the defendant's culpability." *Tuilaepa,* 512 U.S. at 973, 114 S.Ct. 2630. "In making the selection decision, the Act requires that the sentencing jury consider all of the aggravating and mitigating factors...." *Jones,* 527 U.S. at 377, 119 S.Ct. 2090 (citing 18 U.S.C. §§ 3591(a), 3592, 3593(e)). "The Act, however, requires more exacting proof of aggravating factors than mitigating ones." *Id.* In order to warrant consideration of an aggravating factor in selecting a penalty, the government must establish that factor—whether statutory or non-statutory—beyond a reasonable doubt. *Id.* "[T]he jury may consider a mitigating factor in its weighing process so long as one juror finds that the defendant established its existence by preponderance of the evidence...." *Id.* (citing 18 U.S.C. § 3593(c), (d)). After finding which factors are relevant to its inquiry,

the jury is required to consider "whether all the aggravating factor or factors found to exist sufficiently outweigh all the mitigating factor or factors found to exist to justify a sentence of death, or, in the absence of a mitigating factor, whether the aggravating factor or factors alone are sufficient to justify a sentence of death." 18 U.S.C. § 3593(e). "Based upon this consideration, the jury by unanimous vote ... shall recommend whether the defendant should be sentenced to death, [or] to life imprisonment without the possibility of release." *Id.*

The FDPA further provides that "[i]nformation is admissible regardless of its admissibility under the rules governing admission of evidence at criminal trials except that information may be excluded if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury." *Id.* § 3593(c).

In the next section, the Court tackles the difficult issue of whether a defendant's Sixth Amendment right to confront the witnesses against him extends to the eligibility and selection phases of capital sentencing.

## III. Right to Confrontation During Capital Sentencing

The Sixth Amendment to the Constitution provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." U.S. Const. Amend. VI. In its landmark decision in *Crawford v.*

*Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the Supreme Court held that the Confrontation Clause bars admission of "testimonial statements" of a witness who does not appear at trial, unless the witness is unavailable to testify, and the defendant previously had the opportunity to cross-examine the declarant. *Id.* at 53–54, 124 S.Ct. 1354.

*Crawford* classifies hearsay evidence into two types: testimonial and non-testimonial. *Id.; see Davis v. Washington,* —— U.S. ——, 126 S.Ct. 2266, 2273–74, 165 L.Ed.2d 224 (2006). While the Court in *Crawford* declined to offer a definitive definition of "testimonial," it offered three "formulations of [the] core class of 'testimonial' statements:"

> [ (1) ] "*ex parte* in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially," [ (2) ] "extrajudicial statements ... contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions," [ (3) ] "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial[.]"

*Jensen v. Pliler*, 439 F.3d 1086, 1089 (9th Cir.2006) (quoting *Crawford*, 541 U.S. at 51–52, 124 S.Ct. 1354) (alterations in original).[2]

**2.** As to non-testimonial statements, the post-*Crawford* standard remains unclear. *See Jensen*, 439 F.3d at 1090 (declining to resolve issue); *United States v. Weiland*, 420 F.3d 1062, 1076 (9th Cir.2005) (same); *see also Crawford*, 541 U.S. at 68, 124 S.Ct. 1354 ("Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design

to afford the States flexibility in their development of hearsay law-as does *Roberts,* and as would an approach that exempted such statements from Confrontation Clause scrutiny altogether."). At least two of the justices who joined the *Crawford* majority have indicated that the Confrontation Clause provides no protection against non-testimonial hearsay,

Throughout the five-month guilt phase of this trial, the Court and the parties have struggled to apply the Supreme Court's decision in *Crawford*.[3] Having moved on to the penalty phase, the Court is now presented with yet another novel issue concerning the Confrontation Clause: Do each of the Defendants enjoy the right "to be confronted by the witnesses against him" during both the eligibility and selection phases of capital sentencing?

As discussed below, resolution of this issue depends upon where the line is drawn between a defendant's Sixth Amendment rights at trial, where they are expansive, and his rights at sentencing, where they are diminished in favor of broad sentencing discretion. Although this line would seem to naturally fall between a jury's verdict of guilt and the sentencing of a defendant, recent Supreme Court decisions complicate the matter in

death penalty cases, and strongly suggest that a defendant's Sixth Amendment expansive trial rights extend into the eligibility and selection phases.[4] In light of these recent cases, the Court concludes for the reasons outlined below that the constitutional right to confrontation applies to both phases of federal capital sentencing.

### A. *Williams v. New York* and Broad Discretion in Sentencing

In *Williams v. New York*, 337 U.S. 241, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949), the Supreme Court held that a judge's ability to exercise broad discretion at sentencing should not be restricted by limitations on uncross-examined hearsay evidence. In *Williams*, the judge overrode the jury's non-binding recommendation that the defendant receive life imprisonment for first-degree murder, and instead sentenced the defendant to death. In giving his reasons

---

beyond that provided by the rules of evidence. *See Lilly v. Virginia*, 527 U.S. 116, 143, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999) (Scalia, J., concurring); *id.* (Thomas, J., concurring). However, this approach was rejected by a majority of the Court in *White*. *See* 502 U.S. at 352–53, 112 S.Ct. 736; *see also Crawford*, 541 U.S. at 61, 124 S.Ct. 1354 ("Although our analysis in this case casts doubt on [*White's*] holding, we need not definitively resolve whether it survives our decision today . . . .").

The alternative approach for non-testimonial hearsay would be to continue to apply the former standard from *Ohio v. Roberts*, 448 U.S. 56, 66, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), which was rejected by *Crawford* as to testimonial evidence. *See Crawford*, 541 U.S. at 68–69, 124 S.Ct. 1354. The *Roberts* standard holds that the introduction of hearsay does not offend the Sixth Amendment when it is either admitted pursuant to a "firmly rooted hearsay exception," or accompanied by "particularized guarantees of trustworthiness." *See Jensen*, 439 F.3d at 1090. This approach has been adopted by three circuits. *See United States v. Brun*, 416 F.3d 703, 707 (8th Cir.2005); *United States v. Hendricks*, 395 F.3d 173, 182 (3d Cir.2005); *Horton v. Allen*, 370 F.3d 75, 84 (1st Cir.2004).

**3.** *See, e.g.,* June 6, 2006 Amended Order Re: Admissibility of Trial Testimony from *United States v. Sahakian*, docket no. 3144 (addressing issues raised by *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), regarding statements that were simultaneously testimonial and non-testimonial); February 17, 2006 Order Re: Admissibility of Evidence Related to Defendant Mills's Conviction for the Murder of John Marzloff, docket no. 2795 (addressing prior testimony of unavailable witnesses and allowing admission of record of conviction); December 22, 2005 Order Denying in Part and Reserving Decision in Part Defendant Mills's Motion to Preclude Evidence Pursuant to *Crawford*, Fed. R.Evid. 403, 801(d)(2)(E) and 805, docket no. 2689 (addressing *Crawford* and co-conspirator hearsay).

**4.** The Court's analysis draws upon the thoughtful discussion of the issue in John G. Douglass, *Confronting Death: Sixth Amendment Rights at Capital Sentencing*, 105 Colum. L.Rev.1967 (2005) [hereinafter *Confronting Death*].

for the increased penalty, the judge stated that, as permitted by state law, he relied on evidence not presented to the jury, including a probation report and other sources. The Supreme Court held that this practice did not violate the defendant's right to due process under the Fourteenth Amendment. *Id.* at 245, 69 S.Ct. 1079.

The Supreme Court noted that the "country has traveled far from the period in which the death sentence was an automatic and commonplace result of convictions," *id.* at 247, 69 S.Ct. 1079, and that this evolution necessarily entailed "an increase in the discretionary powers exercised in fixing punishments," *id.* at 249, 69 S.Ct. 1079. As part of this increase in discretion, sentencers require greater access to information about the character and history of the defendant and nature of the crime. *Id.* at 248–49, 69 S.Ct. 1079. "We must recognize that most of the information now relied upon by judges to guide them in the intelligent imposition of sentences would be unavailable if information were restricted to that given in open court by witnesses subject to cross-examination." *Id.* at 250, 69 S.Ct. 1079.

According to *Williams,* the fact that the choice was between life and death was of no constitutional moment:

> [I]n considering whether a rigid constitutional barrier should be created, it must be remembered that there is possibility of abuse wherever a judge must choose between life imprisonment and death. And it is conceded that no federal constitutional objection would have been possible if the judge here had sentenced appellant to death because appellant's trial manner impressed the judge that appellant was a bad risk for society, or if the judge had sentenced him to death giving no reason at all. We cannot say that the due-process clause renders a sentence void merely because a judge gets additional out-of-court information to assist him in the exercise of this awesome power of imposing the death sentence.

*Id.* at 251–52, 69 S.Ct. 1079.[5]

Since the *Williams* decision, death penalty jurisprudence has evolved significantly in recognition of a capital defendant's constitutional rights. *See Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). The Supreme Court has recognized that a jury's unguided discretion in making the ultimate decision of life or death violates the Eighth Amendment. *See id.* at 239, 92 S.Ct. 2726. The maturing case law recognizes the unique nature of death as the ultimate penalty and the concomitant need for heightened procedural protections. *See Murray,* 492 U.S. at 8–9, 109 S.Ct. 2765; *Woodson,* 428 U.S. at

---

**5.** As noted by the government during argument, *Williams* came to its conclusion resting on historical practices giving judges wide discretion in sentencing. 337 U.S. at 246, 69 S.Ct. 1079. However, *Williams* failed to fully recognize that at the time of the founding, a death sentence automatically accompanied most felony convictions. *See Lockett v. Ohio,* 438 U.S. 586, 598, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978); *see also* Rory K. Little, *The Federal Death Penalty: History and Some Thoughts About the Department of Justice's Role,* 26 Ford. Urb. L.J. 347, 360 (1999). The harshness of the automatic penalty led juries to exercise their discretion in the only way they could—by refusing to convict. *Lockett,* 438 U.S. at 598, 98 S.Ct. 2954 ("[J]uries, with some regularity, disregarded their oaths and refused to convict defendants where a death sentence was the automatic consequence of a guilty verdict."). Thus, in effect, the jury would be called on to impose a death sentence, and it would do so based on the evidence subject to all of the protections of a full adversary trial. *See Confronting Death* at 2011–18; *see also id.* at 1977–78 (noting that none of the citations in *Williams* "contains a capital case for any American jurisdiction prior to—or even near—the founding").

305, 96 S.Ct. 2978. While *Williams's* holding may be rendered questionable in the capital context by this evolution in death penalty jurisprudence, the case has never been explicitly overruled. *See Gardner v. Florida,* 430 U.S. 349, 356–57, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977) (plurality opinion) (distinguishing *Williams* and recognizing that "the passage of time justifies a reexamination of capital-sentencing procedures ... against evolving standards of procedural fairness in a civilized society");[6] *see also United States v. Littlesun,* 444 F.3d 1196, 1200 (9th Cir.2006) (stating that "it is not for us to overrule the Supreme Court's decision in *Williams*"); *People v. Monge,* 16 Cal.4th 826, 857, 66 Cal.Rptr.2d 853, 941 P.2d 1121 (1997) (stating that "though the high court has retreated from *Williams* in capital cases, it has otherwise reaffirmed *Williams* as recently as last term" (internal citations omitted) (citing *United States v. Watts,* 519 U.S. 148, 117 S.Ct. 633, 136 L.Ed.2d 554 (1997))). Indeed, the Supreme Court in *Gardner* was careful to note that "[t]he fact that due process applies does not, of course, implicate the entire panoply of criminal trial procedural rights." 430 U.S. at 358 n. 9, 97 S.Ct. 1197.

Following *Williams,* the Ninth Circuit has recently recognized the line between Sixth Amendment trial rights and sentencing rights, holding that the hearsay-limiting rights afforded by the Confrontation Clause do not apply to *non-capital sentencing,* where the judge, not the jury, makes the sentencing determination. *Litt-*lesun, 444 F.3d at 1199–1200 (noting that *Crawford* does not overrule *Williams*). However, the Ninth Circuit did not address whether *Williams* is still good law with respect to its holding that the Confrontation Clause does not apply in the *capital sentencing* context, particularly capital sentencing under the FDPA, which, unlike the sentencing scheme in Williams, places the ultimate sentencing decision with the jury. The Court examines this issue next.

## B. Constitutional Significance of Factfinding

In tension with the need for discretion in sentencing, the Supreme Court has assigned constitutional significance to certain types of factfinding that may occur during sentencing. In *Specht v. Patterson,* 386 U.S. 605, 87 S.Ct. 1209, 18 L.Ed.2d 326 (1967), a defendant was sentenced under a Colorado statute that, upon conviction of certain sex offenses, allowed the trial judge to sentence the defendant to an *additional* sentence of one day to life. *Id.* at 607, 87 S.Ct. 1209. The additional sentence was to be imposed if the court found that the defendant "constitute[d] a threat of bodily harm to members of the public, or [was] an habitual offender and mentally ill." *Id.* The procedure for imposing this additional sentence required the judge to order the defendant to undergo a psychological examination. A report of the examination was then provided to the court, which could use the report as the basis for

---

6. Like *Williams,* *Gardner* involved a jury's advisory verdict for life which was overridden by the sentencing judge, who imposed a death sentence. 430 U.S. at 353, 97 S.Ct. 1197. Like the appellant in *Williams,* Gardner challenged on due process grounds the fact that the judge based his sentencing decision on a presentence report containing facts outside the record, which were not subject to cross examination. *Id.* at 357–58, 97 S.Ct. 1197.

However, *Gardner* is distinguishable from *Williams* because the sentencing judge in *Gardner* relied on a presentence report that contained confidential information that was never revealed to the defendant, and the judge did not explain what portions of the report he relied on. *Id.* at 354, 97 S.Ct. 1197. The Supreme Court held that the defendant's right to due process was violated by this sentencing procedure. *Id.* at 362, 97 S.Ct. 1197.

imposing the additional sentence without a hearing or confrontation by the defendant. *Id.* at 607–08, 87 S.Ct. 1209.

A unanimous Supreme Court reversed the conviction. The Court recognized that the Sex Offenders Act "makes one conviction the basis for commencing another proceeding under another Act to determine whether a person constitutes a threat of bodily harm to the public, or is an habitual offender and mentally ill. That is a new finding of fact that was not an ingredient of the offense charged." *Id.* at 608, 87 S.Ct. 1209. Thus, "the invocation of the Sex Offenders Act means the making of a new charge leading to criminal punishment." *Id.* at 610, 87 S.Ct. 1209.

In so holding, the Supreme Court ruled that the Constitution extends certain trial rights—including the right to confrontation—to *some* proceedings where a factfinder finds facts that necessarily subject a criminal defendant to additional liability. Although *Specht* did not explicitly mention the Sixth Amendment, the Court held that "[d]ue process ... requires that [the defendant] be present with counsel, have an opportunity to be heard, *be confronted with witnesses against him, have the right to cross-examine,* and to offer evidence of his own." *Id.* (emphasis added). Therefore, once the activity of a sentencer stops being an exercise of discretion and becomes constitutionally significant factfinding, the right to confrontation attaches. *See also United States v. Buckland,* 289 F.3d 558, 568 (9th Cir.2002) (en banc)

(holding that functional equivalent of an element of a crime must be treated as "any other material fact in a criminal prosecution: it must be charged in the indictment, submitted to the jury, subject to the rules of evidence, and proved beyond a reasonable doubt").

█ *Specht* makes clear that some factfinding will give rise to confrontation rights. *Specht* does not, however, establish when factfinding has constitutional force. In order to define the scope of what constitutes constitutionally significant factfinding, it is instructive to look to the Supreme Court's recent decisions concerning another Sixth Amendment right, the right to jury trial. These decisions suggest that the jury's rendering of a guilty verdict does not definitely demarcate the line between capital trial rights and sentencing rights. Instead, these cases support the proposition that a defendant's Sixth Amendment trial rights extend at least to the eligibility phase of capital sentencing, where a jury is required to find facts that make the defendant eligible for the death penalty.

**1. Factfinding and the Right to a Jury Trial:** *Apprendi v. New Jersey*

█ In *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), the Court struck down New Jersey's sentencing scheme that allowed a judge to impose a sentencing enhancement for hate crimes.[7] The Court held that "it

---

7. In *Apprendi,* the defendant "pleaded guilty to two counts ... of second-degree possession of a firearm for an unlawful purpose, and one count ... of the third-degree offense of unlawful possession of an antipersonnel bomb.... Under state law, a second-degree offense carries a penalty range of 5 to 10 years ...; a third-degree offense carries a penalty range of between 3 and 5 years...." *Id.* at 469–70, 120 S.Ct. 2348 (internal cita-

tions omitted). "A separate statute, described ... as a 'hate crime' law, provide[d] for an 'extended term' of imprisonment if the trial judge finds, by a preponderance of the evidence, that '[t]he defendant in committing the crime acted with a purpose to intimidate an individual or group of individuals because of race, color, gender, handicap, religion, sexual orientation or ethnicity.'" *Id.* at 468–69, 120 S.Ct. 2348 (first alteration added). "The ex-

is unconstitutional for a legislature to remove from the jury the assessment of facts that increase the prescribed range of penalties to which a criminal defendant is exposed. It is equally clear that such facts must be established by proof beyond a reasonable doubt." *Id.* at 490, 120 S.Ct. 2348 (quoting *Jones v. United States,* 526 U.S. 227, 252–53, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999) (Stevens, J., concurring)). The Court rejected the notion that the Sixth Amendment's right to jury trial could be avoided by merely labeling these facts "sentencing factors." The "relevant inquiry is one *not of form, but of effect*— does the required finding expose the defendant to a greater punishment than that authorized by the jury's guilty verdict?" *Id.* at 494, 120 S.Ct. 2348 (emphasis added). "[W]hen the term 'sentence enhancement' is used to describe an increase beyond the maximum authorized statutory sentence, it is the *functional equivalent of an element of a greater offense* than the one covered by the jury's guilty verdict." *Id.* at 494, 120 S.Ct. 2348 (emphasis added). Thus, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Id.* at 490, 120 S.Ct. 2348.

## 2. Factfinding in the Eligibility Phase of Capital Sentencing: *Ring v. Arizona*

The Court applied the rule in *Apprendi* to Arizona's death penalty statute in *Ring v. Arizona,* 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). Arizona's death penalty statute entailed the following steps: (1) conviction of an enumerated crime, to be found by the jury; (2) a judicial finding regarding the presence of at least one statutorily listed aggravating factor; (3) judicial findings regarding mitigating circumstances; and (4) a judicial weighing of aggravators against mitigators. *Id.* at 592–93, 122 S.Ct. 2428. Steps two through four were to be supported by an evidentiary hearing "to be conducted before the court alone." *Id.* at 592, 122 S.Ct. 2428. "The State's law authorizes the judge to sentence the defendant to death only if there is at least one aggravating circumstance and 'there are no mitigating circumstances sufficiently substantial to call for leniency.'" *Id.* at 593, 122 S.Ct. 2428 (quoting Ariz.Rev.Stat. § 13–703(F) (2001)). The defendant in *Ring,* who had been sentenced in accordance with the statutory procedure, challenged only the judicial finding in step two of the procedure—the judge's finding of an aggravating fact that made him "eligible" for a death sentence.[8]

The *Ring* Court construed the sentencing scheme as requiring the finding of the aggravating factor in order to render the defendant eligible for the death penalty. *Id.* at 604, 122 S.Ct. 2428. Reiterating *Apprendi's* instruction that the inquiry ought to focus on effect over form, the Court determined that the "required finding of an aggravated circumstance exposed Ring to a greater punishment than that authorized by a jury's verdict." *Id.* (quot-

---

tended term authorized by the hate crime law for second-degree offenses is imprisonment for 'between 10 and 20 years.'" *Id.* at 469, 120 S.Ct. 2348. The trial judge found that the hate crime enhancement applied and sentenced Apprendi to twelve years on the second degree count. *Id.* at 471, 120 S.Ct. 2348.

8. 536 U.S. at 597 n. 4, 122 S.Ct. 2428 (noting that Ring was not arguing the unconstitutionality of judicial findings of mitigating factors; the ultimate judicial determination as to whether to impose the death penalty; the Arizona Supreme Court's authority to reweigh the aggravating and mitigating factors, having struck an aggravator on appeal; or the failure to indict on aggravating factors).

ing *Apprendi*, 530 U.S. at 494, 120 S.Ct. 2348) (alterations in original omitted). "If a State makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact—no matter how the State labels it—must be found by a jury beyond a reasonable doubt." *Id.* at 602. Thus, because such a finding stood between the defendant and the state's power to sentence him to death, the "enumerated aggravating factors[⁹] operate as the functional equivalent of an element of a greater offense, [and] the Sixth Amendment requires that they be found by a jury." *Id.* at 609, 122 S.Ct. 2428 (internal quotation marks and citations omitted).

■■■ Stated generally, *Ring* stands for the proposition that a jury must find, beyond a reasonable doubt, whatever facts are necessary to satisfy the "eligibility" function of a capital sentencing scheme.[10] Absent those findings, the state has no power to impose a sentence of death. However, *Ring* left open the question of whether facts found as part of the "selection" function must be the subject of jury findings, with all of the attendant constitutional protections.

### 3. Right to Confrontation During the Eligibility Phase of Sentencing

Although *Ring* extends the Sixth Amendment's right to a jury trial to the eligibility phase, it does not squarely address the right presently at issue: namely, the right to confrontation. However, the Supreme Court's analysis in *Ring* strongly suggests that the Confrontation Clause

---

**9.** *Ring* was somewhat ambiguous about whether a jury need find only a single aggravating factor, which would render the defendant "eligible" for the death penalty, or whether all of the aggravating factors should be subject to jury proof. On remand, the Arizona Supreme Court held that *Ring's* mandate called for the submission of all aggravating factors to the jury. *State v. Ring*, 204 Ariz. 534, 65 P.3d 915, 942–43 (2003).

**10.** *Harris v. United States*, 536 U.S. 545, 122 S.Ct. 2406, 153 L.Ed.2d 524 (2002) (plurality opinion), decided on the same day as *Ring*, addressed the issue of factfinding with respect to the mandatory minimum sentences provided in 28 U.S.C. § 924(c). Section 924(c) criminalizes using or carrying a firearm in connection with a crime of violence or a drug trafficking crime. In addition to the penalty provided for the underlying crime, the statute provides for an additional sentence, to be served consecutively. The statutory maximum punishment for a § 924(c) violation is life in prison. *See United States v. Dare*, 425 F.3d 634, 640 (9th Cir.2005). The statute provides for an increasing series of mandatory minimums, based on both the nature of the firearm, and other firearm-related conduct undertaken as part of the offense. *See* 18 U.S.C. § 924(c).

The question presented to the Court in *Harris* was whether the *Apprendi* rule attached to the facts required to increase the mandatory minimum sentences, i.e., must a jury find that the defendant "brandished" a firearm beyond a reasonable doubt? *See Harris*, 536 U.S. at 551, 122 S.Ct. 2406. The *Harris* Court held by a plurality that it was not, reasoning that because the mandatory minimum sentences did not raise the statutorily proscribed maximum sentence, they could be treated as "sentencing factors" subject to judicial factfinding because that does not "expose a defendant to a punishment greater than that otherwise legally prescribed." *Id.* at 565, 122 S.Ct. 2406. "Judicial factfinding in the course of *selecting* a sentence within the authorized range does not implicate the indictment, jury-trial, and reasonable-doubt components of the Fifth and Sixth Amendments." *Id.* at 558, 122 S.Ct. 2406 (emphasis added). Thus, the Court concluded:

> [T]hose facts setting the outer limits of a sentence, and of the judicial power to impose it, are the elements of the crime for the purposes of the constitutional analysis. Within the range authorized by the jury's verdict, however, the political system may channel judicial discretion—and rely upon judicial expertise—by requiring defendants to serve minimum terms after judges make certain factual findings.

*Id.* at 567, 122 S.Ct. 2406.

also applies to the eligibility phase, in contravention of the Court's earlier holding in *Williams*.

As an initial matter, the Court recognizes that there is a great deal of disagreement over whether and to what extent *Williams* still controls the issue presented in this case. Some courts cite *Williams* for the proposition that the penalty phase of a capital trial presents no exception to the general rule that defendants have no confrontation rights during sentencing. *See Del Vecchio v. Ill. Dep't of Corr.*, 31 F.3d 1363, 1388 (7th Cir.1994) (en banc) (holding that "[t]here is no exception to this rule in a capital case" and citing *Williams*); *Bassette v. Thompson*, 915 F.2d 932, 939 (4th Cir.1990); *see also Chandler v. Moore*, 240 F.3d 907, 918 (11th Cir.2001) (citing *Del Vecchio*, 31 F.3d at 1387–88).[11]

Other courts have held, with respect to at least some evidence, that *Williams* should not continue to be followed in the capital context. *See Proffitt v. Wainwright*, 685 F.2d 1227, 1254–55 (11th Cir. 1982).

Many other courts have understandably sought to avoid the issue. *See United States v. Brown*, 441 F.3d 1330, 1361 & n. 12 (11th Cir.2006) (citing *Proffitt*, 685 F.2d at 1254–55); *United States v. Higgs*, 353 F.3d 281, 324 (4th Cir.2003); *United States v. Hall*, 152 F.3d 381, 405–06 & n. 13 (5th Cir.1998); *State v. Stephenson*, 195 S.W.3d 574, 590 (2006).

Finally, many courts have applied the Confrontation Clause to the penalty phase without noting any controversy regarding its applicability. *See Coble v. Dretke*, 444 F.3d 345, 353–54 (5th Cir.2006). This result is observed in the vast majority of state cases. *See, e.g., Perez v. State*, 919 So.2d 347, 368 (Fla.2005); *State v. Ross*, 269 Conn. 213, 282, 849 A.2d 648 (2004); *State v. Nobles*, 357 N.C. 433, 435–37, 584 S.E.2d 765 (2003); *Grant v. State*, 58 P.3d 783, 797 (Okla.Ct.Crim.App.2002); *State v. Carter*, 888 P.2d 629, 642 (Utah 1995); *Johnson v. State*, 584 N.E.2d 1092, 1105 (Ind.1992); *People v. Wharton*, 53 Cal.3d 522, 589, 280 Cal.Rptr. 631, 809 P.2d 290 (1991); *State v. Moen*, 309 Or. 45, 86, 786 P.2d 111 (1990); *Commonwealth v. Green*, 525 Pa. 424, 465–66, 581 A.2d 544 (1990) (citing *Gardner*, 430 U.S. at 349, 97 S.Ct. 1197); *Smith v. State*, 676 S.W.2d 379, 390–92 (Tex.Ct.Crim.App.1984); *see also People v. Floyd*, 1 Cal.3d 694, 719, 83 Cal.Rptr. 608, 464 P.2d 64 (1970) ("We agree that *Aranda* and *Bruton* [ [12]] apply to the penalty phase of a criminal proceeding. The importance of the right to timely cross-examination has been sufficiently emphasized by this court and the United States Supreme Court and requires no prolonged discussion."); *Lord v. State*, 107 Nev. 28, 44, 806 P.2d 548 (1991) (holding that *Bruton* applies during penalty phase (citing *Floyd*, 1 Cal.3d at 719, 83 Cal.Rptr. 608, 464 P.2d 64)); *but see State v. Grisby*, 97 Wash.2d 493, 509, 647 P.2d 6 (1982) ("Neither *Bruton v. United States*, *supra*, nor *Pointer v. Texas*, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965)[ [13]], in-

11. *Chandler's* reliance on *Del Vecchio* is perplexing given that there is Eleventh Circuit authority distinguishing *Williams* and holding that the right to confrontation applies at the penalty stage. *See Proffitt v. Wainwright*, 685 F.2d 1227, 1254–55 (11th Cir.1982).

12. *Bruton v. United States*, 391 U.S. at 129–30, 88 S.Ct. 1620, applied the Confrontation Clause to the confessions of co-defendants in

joint trials. *People v. Aranda*, 63 Cal.2d 518, 530, 47 Cal.Rptr. 353, 407 P.2d 265 (1965), is *Bruton's* analogue under California state law.

13. "We hold today that the Sixth Amendment's right of an accused to confront the witnesses against him is likewise a fundamental right and is made obligatory on the States

volves the penalty phase proceeding in a bifurcated trial.").

At least one district court has directly addressed the question of how *Ring* influences the availability of confrontation rights during capital sentencing. In *United States v. Jordan*, 357 F.Supp.2d. 889 (E.D.Va.2005), a district court squarely addressed the precise issue presented here: Does *Crawford* bar the introduction of testimonial hearsay in the penalty phase of a capital case? *Id.* at 898. The *Jordan* court followed the Fourth Circuit's decision in *Higgs*, 353 F.3d at 298, which held that the statutory aggravating factors and statutory intent factors must be alleged in the indictment because they are necessary to render the defendant eligible for the death penalty. The *Jordan* court determined that when finding facts related to "eligibility," the same due process protections applied as during the proof of elements. 357 F.Supp.2d at 903. Thus, the court found that *Crawford* would bar testimonial hearsay during the proof of the eligibility elements in the penalty phase.

However, *Jordan* noted that "no court has applied the teachings of *Ring* beyond the statutory factors at issue in the eligibility phase." *Id.* The court continued:

Unlike the eligibility phase, the selection phase is intended to be less structured and less encumbered by strict adherence to the Rules of Evidence. Evidence which is relevant to the statutory factors underlying the eligibility issue may have no bearing on the nonstatutory factors governing selection for the death penalty. Unless its probative value is substantially outweighed by the danger of unfair prejudice, the jury should "have

as much information before it as possible when it makes the sentencing decision."

*Id.* (quoting *Gregg v. Georgia*, 428 U.S. 153, 203–04, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976)).

At the suggestion of the government, the *Jordan* court decided to divide the penalty phase into separate eligibility and selection phases. If the penalty phase progressed to selection, the court would permit the introduction of testimonial hearsay, provided its probative value was not outweighed by the danger of unfair prejudice. *Id.* at 903–04.

Following the decision in *Jordan*, this Court agrees that the logic of *Ring* renders, at a minimum, steps one and two (together constituting the eligibility phase) of the FDPA sentencing procedure as pure findings of fact. The government does not contest this position. Therefore, the Court holds that the Sixth Amendment right to confrontation applies to the eligibility phase of sentencing.[14]

The Court does not agree, however, with the district court's conclusion in *Jordan* that the Confrontation Clause does not apply during the selection phase. *Jordan* reasoned that the right of confrontation should not apply at the selection phase because "the Supreme Court has also urged trial courts to admit more evidence, not less, on the presence or absence of aggravating and mitigating factors." 357 F.Supp.2d. at 903. To the extent that this entails relaxing the formalized rules of evidence, codified in the standard delineated at 18 U.S.C. § 3593(c), this Court agrees. *See Gregg v. Georgia*, 428 U.S. 153, 203–04, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) ("We

by the Fourteenth Amendment." *Pointer*, 380 U.S. at 403, 85 S.Ct. 1065.

**14.** Other district courts have followed the reasoning in *Jordan*. *See United States v. John-*

*son*, 378 F.Supp.2d 1051, 1060–62 (N.D.Iowa 2005); *United States v. Bodkins*, 2005 WL 1118158, at *4–5 (W.D.Va. May 11, 2005).

think it desirable for the jury to have as much information before it as possible when it makes the sentencing decision."); *Jurek v. Texas,* 428 U.S. 262, 276, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976) (noting that the jury should "have before it all possible relevant information about the individual defendant whose fate it must determine.").

However, this call to admit more evidence does not sanction the admission of unconstitutional evidence against the defendant. "Given the gravity of the decision to be made at the penalty phase, the [government] is not relieved of the obligation to observe fundamental constitutional guarantees." *See Estelle v. Smith,* 451 U.S. 454, 463, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981) (vacating defendant's death sentence because evidence introduced at penalty phase violated his Fifth Amendment privilege against self-incrimination and Sixth Amendment right to counsel).[15] Moreover, as this Court has emphasized repeatedly during the evidentiary hearings regarding the penalty phase, the fact that this Court holds that *Crawford* applies to the entire penalty phase of the case does not render the government unable to prove their allegations of future dangerousness. It merely requires the government to provide evidence through witnesses who have first hand knowledge of the events in question, rather than through stacks of silent documents replete with unconstitutional hearsay.

As the Court observed in *Ring:*

The notion "that the Eighth Amendment's restriction on a state legislature's ability to define capital crimes should be compensated for by permitting States more leeway under the Fifth and Sixth Amendments in proving an aggravating fact necessary to a capital sentence ... is without precedent in our constitutional jurisprudence."

536 U.S. at 606, 122 S.Ct. 2428 (quoting *Apprendi,* 530 U.S. at 539, 120 S.Ct. 2348 (O'Connor, J., dissenting)) (alteration in original). Thus, while the Court recognizes the policy reasons encouraging the admission of the maximum quantum of evidence during the selection phase, that policy is insufficient to override Defendants' right to confront witnesses during such a critical portion of the capital trial.

The Court's most fundamental difference with *Jordan's* conclusion, however, is that the *Jordan* court failed to adequately address the effects of recent Supreme Court decisions expanding the constitutional significance of factfinding as established by *Ring.* After analyzing the impact of those decisions, a task which is undertaken in the next section, the Court is left with the inexorable conclusion that con-

---

**15.** Further, although the Eighth Amendment mandates the admission and consideration of all evidence relevant to mitigation, *see McKoy v. North Carolina,* 494 U.S. 433, 440–41, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990), no such standard applies to aggravating evidence. Indeed, this truism is recognized by the FDPA, which permits consideration of aggravators *only* if they have been proven beyond a reasonable doubt, but allows discretion as to mitigators. *See* 18 U.S.C. § 3593(c); *cf. Marsh,* 126 S.Ct. at 2523.

Moreover, several courts, including *Jordan,* have held that the continuing independent constitutional gatekeeping function of the court saves the constitutionality of the relaxed evidentiary standard in § 3593(c). *See United States v. Fell,* 360 F.3d 135, 145–46 (2d Cir. 2004) ("Congress has the authority to set forth rules of evidence in federal trials subject only to the requirement that the rules comport with the Constitution, and it may 'modify or set aside any judicially created rules of evidence and procedure that *are not required by the Constitution.*'") (quoting *Dickerson v. United States,* 530 U.S. 428, 437, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000)) (emphasis added); *United States v. Johnson,* 378 F.Supp.2d 1051, 1058 (N.D.Iowa 2005); *Jordan,* 357 F.Supp.2d. at 903.

frontation rights must apply to the entirety of the penalty phase of capital trials, including the selection phase.[16]

## C. Applying the Confrontation Clause to the Selection Phase After *Blakely* and *Booker*

The Supreme Court's reasoning in its recent decisions in *Blakely v. Washington,* 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), and *United States v. Booker,* 543 U.S. 220, 233, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), concerning sentencing guidelines schemes, supports the conclusion that the Confrontation Clause applies to the selection phase and at least part of the eligibility phase of capital sentencing.

### 1. *Blakely, Booker* and the Confrontation Clause

In *Blakely,* the Court relied on *Apprendi* in striking down Washington's sentencing guideline scheme that permitted the judge to impose a sentence higher than the standard range if he found certain aggravating factors justifying a departure. 542 U.S. at 299, 304–05, 124 S.Ct. 2531.[17] The Court held:

> Our precedents make clear ... that the "statutory maximum" for *Apprendi* purposes is the maximum sentence a judge

may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant.* ... In other words, the relevant "statutory maximum" is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose *without* any additional findings. When a judge inflicts punishment that the jury's verdict alone does not allow, the jury has not found all the facts "which the law makes essential to the punishment," ... and the judge exceeds his proper authority.

*Id.* at 303–04, 124 S.Ct. 2531 (internal citations omitted). The Court distinguished *Williams* on the grounds that in each of those cases, the jury verdict alone was sufficient to authorize the sentence. *Id.* at 305, 124 S.Ct. 2531 (noting that "*Williams* involved an indeterminate-sentencing regime [because t]he judge could have sentenced [the defendant] to death giving no reason at all" (internal quotation marks omitted) (first alteration added)). In contrast, whenever "the judge's authority to impose an enhanced sentence depends on finding a specified fact (as in *Apprendi* ), one of several specified facts (as in *Ring* ), or *any* aggravating fact (as here), it remains the case that the jury's verdict alone does not authorize the sentence. The

---

**16.** There are also troublesome practical issues that would follow from allowing partial application of confrontation in the penalty phase. The first, as noted by *Jordan,* is that the differing evidentiary standards would require dividing the penalty phase—a procedure not foreseen by the FDPA. Second, partial confrontation would invite gamesmanship on the part of the government in allocating statutory aggravators between eligibility and selection. *See Confronting Death* at 2000–02 (discussing this possibility as a "ripple effect" of partial confrontation rights during the penalty phase).

**17.** The defendant in *Blakely* pled guilty to second-degree kidnapping with a firearm for abducting his wife. Washington's kidnapping

statute set the maximum sentence at ten years' imprisonment. However, the state's Sentencing Reform Act provided a "standard range" of forty-nine to fifty-three months. *Id.* at 299, 124 S.Ct. 2531. The sentencing judge was only permitted to impose a sentence higher than the standard range if he found certain aggravating factors justifying a departure. *Id.* After hearing Blakely's wife's account of the kidnapping, the sentencing judge found that Blakely "had acted with 'deliberate cruelty,' a statutorily enumerated ground for departure in domestic-violence cases." *Id.* at 300, 124 S.Ct. 2531. Based on that finding, the judge imposed a sentence of ninety months.

judge acquires that authority only upon finding some additional fact." *Id.*

Responding to the dissent, the *Blakely* majority distinguished acts of judicial discretion in indeterminate sentencing regimes. In these regimes, the court is given the discretion to sentence within a prescribed range. *Id.* at 308, 124 S.Ct. 2531. "Of course indeterminate schemes involve judicial factfinding, in that a judge ... may implicitly rule on those facts he deems important to the exercise of his sentencing discretion." *Id.* at 309, 124 S.Ct. 2531. However, such factfinding does not impinge on the province of the jury because the verdict itself has authorized a sentence within the range.

Thus, the *Blakely* Court suggested "two alternatives:" (1) determinate sentencing, where specific facts found by the jury constrain the judge and authorize a specific sentence; and (2) indeterminate sentencing, where the verdict authorizes the judge to engage in a discretionary act in deciding a sentence. The latter may entail some sort of factfinding, but this factfinding is not of constitutional significance. *See id.* at 309, 124 S.Ct. 2531.

In *United States v. Booker*, 543 U.S. at 233, 125 S.Ct. 738, another 5–4 decision, the Court applied *Blakely* to the Federal Sentencing Guidelines. The Court found "no distinction of constitutional significance" between the federal guidelines and the sentencing regime addressed in *Blakely*, because in both systems, "the relevant sentencing rules are mandatory and impose binding requirements on all sentencing judges." *Id.*

As it had in *Blakely*, the *Booker* Court distinguished non-binding or indeterminate regimes:

> If the Guidelines as currently written could be read as merely advisory provisions that recommended, rather than required, the selection of particular sentences in response to differing sets of facts, their use would not implicate the Sixth Amendment. We have never doubted the authority of a judge to exercise broad discretion in imposing a sentence within a statutory range. *See Apprendi*, 530 U.S., [sic] at 481, 120 S.Ct. [sic] 2348; *Williams v. New York*, 337 U.S. 241, 246, 69 S.Ct. [sic] 1079, 93 L.Ed. 1337 (1949). Indeed, everyone agrees that the constitutional issues presented by these cases would have been avoided entirely if Congress had omitted from the SRA the provisions that make the Guidelines binding on district judges; it is that circumstance that makes the Court's answer to the second question presented possible. For when a trial judge exercises his discretion to select a specific sentence within a defined range, the defendant has no right to a jury determination of the facts that the judge deems relevant.

*Id.* at 233, 125 S.Ct. 738.

However, *Booker* differed from *Blakely* in the remedy. A 5–4 majority of the Court found that the guidelines could be salvaged by severing the provisions that made them mandatory and binding on sentencing judges and the provision governing the standard to be applied on appeal. *Id.* at 259, 125 S.Ct. 738. "Without the 'mandatory' provision, the Act nonetheless requires judges to take account of the Guidelines together with other sentencing goals." *Id.* (citing 18 U.S.C. § 3553(a)). Thus, the remedial portion of *Booker* turned a determinate sentencing regime into an indeterminate—although guided—regime.

*United States v. Green*, 372 F.Supp.2d 168, 175 (D.Mass.2005), had occasion to address *Blakely's* redefinition of "statutory maximum" in the context of the FDPA. *Green* found *Blakely's* definition of "legally

essential" facts to be "ambiguous in the context of the FDPA." *Id.* In addressing whether non-statutory factors are "legally essential," *Green* inferred that "since the FDPA makes punishment contingent on a balancing process, all of the factors to be weighed by the decision-maker should constitute what is 'legally essential' to a defendant's punishment." *Id.* at 175–76. Recognizing *Apprendi's* mandate to look to effect over form, the court found that "the non-statutory aggravators at issue are among a set of factors that *together* expose [the defendants] to a greater punishment than that authorized by the jury's guilty verdict alone." *Id.* at 176. This was also mandated by the fact that proof that the aggravators outweigh the mitigators "is not optional." *Id.* at 177. "Because we will never know exactly how each factor influences the jurors' ultimate punishment determination, logic dictates that all aggravating factors—together—be consider legally essential to the punishment." *Id.*

*Green* then distinguished *Williams. See id.* at 176 n. 18. The *Green* court reasoned that "the FDPA does not amount to the indeterminate sentencing structure examined under *Williams*," because "the possibility of a death sentence does not attach automatically to a murder verdict alone—a jury must balance particular factors to determine punishment." *Id.*

While the Court finds the reasoning in *Green* persuasive, *Green* fails to consider *Booker's* lesson that there are some facts—those which are not binding on the court—that do not rise to the level of constitutional significance. From the Court's perspective, *Booker* and *Blakely* appear to present three potential applications to the issue of confrontation during the selection portion of the penalty phase:

(1) pure factfinding; (2) pure sentencing discretion; and (3) constitutionally significant factfinding.

As to pure factfinding, one could take *Blakely* literally, to mean that the *judge* may impose the death penalty *"solely on the basis of the facts reflected in the jury verdict or admitted by the defendant."* *Blakely*, 542 U.S. at 303, 124 S.Ct. 2531; *see* 18 U.S.C. § 3594 (requiring court to impose sentence on recommendation of jury). Thus, the Sixth Amendment's protections would no longer stop once the jury has found a statutory aggravating factor and a statutory intent factor. Even if these facts have been found, the judge still cannot impose a death sentence under the FDPA until the jury has found that "all the aggravating factor or factors found to exist sufficiently outweigh all the mitigating factor or factors found to exist to justify a sentence of death, or, in the absence of a mitigating factor, whether the aggravating factor or factors alone are sufficient to justify a sentence of death." *See* 18 U.S.C. §§ 3593(e), 3594. Thus, if steps three through six are factfinding, placement of the weighing *after* the jury has already engaged in the eligibility determination is not dispositive.[18]

As to pure sentencing discretion, one could hew closely to *Booker's* rationale, reasoning that the eligibility findings would set the statutory maximum, and then the findings in steps three, four, and five of the FDPA would be factfinding related to the jury's exercise of sentencing discretion in step six, much akin to a judge's factual findings rendered in calculating the non-mandatory Guidelines range. *See* 18 U.S.C. § 3553(a). These findings would *advise*, but they do not bind. Under this rationale, while the find-

---

**18.** Several state supreme courts have determined that "weighing" is a factual determination. *See State v. Whitfield,* 107 S.W.3d 253, 261 (Mo.2003); *Woldt v. People,* 64 P.3d 256, 265–66 (Colo.2003); *Johnson v. State,* 118 Nev. 787, 802–03, 59 P.3d 450 (2002).

ings in steps three, four, and five may be findings of fact, they are not factual findings of constitutional significance. Thus, the right to confrontation would end at selection.[19] *Cf. Williams,* 337 U.S. at 251, 69 S.Ct. 1079.

In the middle of these two extremes is a third application: constitutionally significant factfinding. As *Ring* cautions, the focus of the inquiry must be on effect, not form. *See Ring,* 536 U.S. at 604, 122 S.Ct. 2428. Further, as acknowledged in both *Blakely* and *Booker,* a legislature is entitled to choose between a sentencing system that binds the sentencer to certain findings of fact, and a system that vests the sentencer with a great deal of discretion. It may also construct a scheme that "channels" discretion and thus falls somewhere in between. *See Harris,* 536 U.S. at 567, 122 S.Ct. 2406.[20]

Thus, assuming, without deciding, that steps five and six are discretionary, it is worth considering the context surrounding the findings that constitute steps three and four under the FDPA.

Under the Act, the jury is required to find these facts unanimously and beyond a reasonable doubt. 18 U.S.C. § 3593(c) The jury may consider *only* the factors upon which it has rendered such a finding when it weighs the factors in aggravation and mitigation. 18 U.S.C. § 3593(d). Further, a *jury* renders these findings after a contested adversarial hearing that bears many of the features of a trial.[21] *See* 18 U.S.C. § 3593(b)-(e). The Court finds that these features of the Act render steps three and four significantly different than the judicially found facts that inform a court's calculation of the now non-binding Guidelines. In essence, the FDPA completely limits the jury's discretion until it has rendered its findings on the aggravating factors (whether statutory or non-statutory). Only upon finding these facts is the jury permitted to move on to the more discretionary task of finding the mitigating factors, and the broadly discretionary task of weighing aggravation against mitigation. 18 U.S.C. § 3593(c)-(e). Because of these fundamental structural differences, findings on the aggrava-

---

**19.** Several state supreme courts apply a similar approach, finding that the jury's post-eligibility functions are acts of discretion. *See People v. Demetrulias,* 39 Cal.4th 1, 45 Cal. Rptr.3d 407, 137 P.3d 229 (2006); *Commonwealth v. Roney,* 581 Pa. 587, 866 A.2d 351, 360 (2005); *Ritchie v. State,* 809 N.E.2d 258, 264–68 (Ind.2004); *Ex parte Hodges,* 856 So.2d 936, 943–44 (Ala.2003); *Brice v. State,* 815 A.2d 314, 321–23 (Del.2003); *Oken v. State,* 378 Md. 179, 268, 835 A.2d 1105 (2003); *State v. Gales,* 265 Neb. 598, 628, 658 N.W.2d 604 (2003); *People v. Ballard,* 206 Ill.2d 151, 276 Ill.Dec. 538, 794 N.E.2d 788, 821 (2002); *Torres v. State,* 58 P.3d 214, 216 (Okla.Crim.App.2002). Some of these courts have found that *Blakely* and *Booker* do not disturb their reasoning on this issue. *See Grandison v. State,* 390 Md. 412, 440–42, 889 A.2d 366 (2005); *State v. Fry,* 138 N.M. 700, 126 P.3d 516, 534 (2005); *Pruitt v. State,* 834 N.E.2d 90, 112 (Ind.2005); *People v. Morrison,* 34 Cal.4th 698, 731, 21 Cal.Rptr.3d 682, 101 P.3d 568 (2004).

**20.** The fact that legislatures are given leeway in constructing death penalty sentencing procedures, and that this leeway extends to allocations of factfinding and discretion largely explains the divergent state holdings. *See Marsh,* 126 S.Ct. at 2523 (holding that states may permissibly draft sentencing regimes which cabin the sentencer's exercise of discretion "[s]o long as the sentencer is not precluded from considering relevant mitigating evidence").

**21.** *See Bullington v. Missouri,* 451 U.S. 430, 446, 101 S.Ct. 1852, 68 L.Ed.2d 270 (1981) ("The Court already has held that many of the protections available to a defendant at a criminal trial also are available at a sentencing hearing similar to that required by Missouri in a capital case." (citing *Specht,* 386 U.S. at 608, 87 S.Ct. 1209)).

ting factors bear many of the hallmarks of constitutionally significant facts falling under the ambit of *Blakely.*

It is possible that the jury *could* return a verdict of death without finding any additional aggravating facts, provided the proven aggravator alone is sufficient to outweigh whatever mitigation has been found. *See* 18 U.S.C. § 3593(e). However, given the allocation of factfinding and discretionary tasks under the FDPA, the Court finds that this possibility alone is not sufficient to render these facts constitutionally insignificant for the purposes of confrontation.[22]

For these reasons, the Court finds that all of the alleged aggravating factors— statutory or nonstatutory—are of constitutional significance. Thus, the jury's factfinding with respect to steps three and four should be accompanied by the same constitutional protections as those which accompany the trial of elements.[23]

Based on the foregoing, the Court holds that *Crawford v. Washington's* protections apply to any proof of any aggravating factor during the penalty phase of a capital proceeding under the FDPA. Accordingly, Defendants Mills and Bingham must be afforded the right to confrontation during the selection phase.

**D.** *Crawford's* **Application in the Present Penalty Phase**

Having determined that *Crawford* applies to the eligibility and selection phases

of the trial, the Court now outlines the general principles it applied in ruling on the admissibility of the government's documentary evidence against Defendants Mills and Bingham offered to prove the nonstatutory aggravating factor of future dangerousness. The Court also analyzes some individual documents to demonstrate how it applied these general principles at the admissibility hearing. Again, the Court stresses that its rulings under *Crawford* in no way prohibit the government from proving its allegations through the live testimony of witnesses, and indeed, after learning that the Court had tentatively concluded that *Crawford* governed the whole of the penalty phase, the government managed to locate witnesses to testify regarding many of its most critical allegations. To the extent that finding living witnesses to attest to some of the allegations may be difficult given how long ago much of the alleged conduct occurred, the situation cannot be blamed on *Crawford,* as the government has chosen to rely on proof of incidents that occurred over thirty years ago.

Among the documents offered by the government are presentence and postsentence reports concerning the Defendants. These reports contain descriptions of Mills and Bingham's criminal histories, which the government seeks to present as proof of Defendants' past offenses. At the outset, the Court notes its general concern

**22.** On remand from *Ring,* the Arizona Supreme Court applied a somewhat similar structurally-oriented analysis. *See State v. Ring,* 65 P.3d at 943 ("In both the superseded and current capital sentencing schemes, the legislature assigned to the same fact-finder responsibility for considering both aggravating and mitigating factors, as well as for determining whether the mitigating factors, when compared with the aggravators, call for leniency. Neither a judge, under the superseded statutes, nor the jury, under the new

statutes, can impose the death penalty unless that entity concludes that the mitigating factors are not sufficiently substantial to call for leniency.").

**23.** Because the factors address the only evidence at issue, the Court need not resolve the additional issue of whether the jury's task of weighing aggravating against mitigating factors is better described as factual or discretionary.

about the admissibility of portions of pre-sentence reports, which often contain multiple layers of hearsay. In his dissent in *Blakely*, Justice Breyer expressed such a concern in light of the Court's decisions in *Blakely* and *Crawford*, asking "[c]an the prosecution continue to use, say presentence reports, with their conclusions reflecting layers of hearsay?" 542 U.S. at 346, 124 S.Ct. 2531 (Breyer, J., dissenting).

■ Nonetheless, the Court concludes that the presentence report itself is not testimonial because it is a statement made in preparation for sentencing and not a statement made "under circumstances which would lead an objective witness reasonably to believe that [it] would be available for use at a later trial." *Parle v. Runnels*, 387 F.3d 1030, 1037 (9th Cir. 2004) (quoting *Crawford*, 541 U.S. at 52, 124 S.Ct. 1354 (quoting *White v. Illinois*, 502 U.S. 346, 365, 112 S.Ct. 736, 116 L.Ed.2d 848 (1992) (Thomas J., concurring))). However, the inquiry does not stop here, as statements within the reports may nevertheless be testimonial under *Crawford*. The Court must therefore look at each level of hearsay. If the statement was made by a person who would reasonably believe his statement would be available for use at a later trial, then it must be excluded under *Crawford*, notwithstanding the fact that the report itself was not prepared in anticipation for trial.

■ For instance, the government seeks to introduce a presentence reports that describes a bank robbery for which Mills was convicted. Although the report's recitation of the offense does not present a *Crawford* problem, the report's detailed description that explicitly relies upon "[i]nvestigative reports" of the robbery does present such a problem. This description is likely based on witness statements to the police, which are "testimonial" under *Crawford*. *See id.* Therefore, the govern-ment cannot offer this description of the robbery in the presentence report to prove Mills's future dangerousness.

The government argues that such descriptions in presentence reports are admissible notwithstanding *Crawford* because Mills had the chance to object to the statements at the time the reports were written and failed to do so. However, Defendant Mills's failure to object in the past does not alter the testimonial nature of the statements when they were originally made. To hold that Mills impliedly waived his future constitutional rights when he did not object to portions of his presentence reports would be contrary to the fundamental holding of *Crawford*, which strengthened defendants' Sixth Amendment rights to confrontation. Moreover, at the time of sentencing more than twenty years ago, Mills did not have the incentive he now has to object to these portions of the presentence reports. Therefore, the testimonial descriptions of the crimes in the presentence reports are not saved by the fact that Mills failed to object to them at the time they were originally written.

■ The testimonial portions of the postsentence reports offered by the government present an even more compelling justification for the *Crawford* rule's application. While Mills at least had the opportunity to review the contents of the presentence reports, in the case of postsentence reports, he had absolutely no opportunity to object to their contents, let alone confront the witnesses against him. Accordingly, these postsentence reports are inadmissible to prove future dangerousness.

The government also seeks to introduce numerous Institution Discipline Committee ("IDC") reports concerning Defendants Mills and Bingham to prove the

non-statutory aggravating factor of future dangerousness. These reports have two components: a face page setting forth the disciplinary ruling of the IDC and an investigative memorandum containing statements made by correctional officers or inmates.

 The face page is not testimonial under *Crawford* because it is a ministerial document. *See United States v. Weiland*, 420 F.3d 1062, 1077 (9th Cir.2005) (holding that "public records, such as judgments, are not themselves testimonial in nature"). Thus, all IDC Report face pages are non-testimonial, regardless of the nature and severity of the infraction reported. The testimonial nature of the investigative memoranda, however, depends upon the nature and severity of the offense reported.

 Many of the IDC reports offered by the government report relatively minor disciplinary infractions for, among other things, cursing at a prison guard, refusing to follow a guard's orders, and being unsanitary. For instance, the government offers an incident report, dated January 24, 1986, regarding an "assault on [a] staff member" by Defendant Bingham. This "assault" occurred when Bingham urinated through a screen of the recreation cage and hit an officer walking below. Another incident reported, dated February 23, 1986, states that Bingham spit in an officer's face because Bingham was denied additional time to speak on the telephone. The government also seeks to introduce an incident report from USP Marion concerning Mills throwing a tray on April 21, 1980. While these reports of insolence were subsequently referred to the IDC for disciplinary action, the statements were not made "under circumstances which would lead an objective witness reasonably to believe that [it] would be available for use at a later trial." *Parle*, 387 F.3d at 1037.

Instead, the circumstances would lead a prison officer to believe that the statements would be used by the IDC for internal prison discipline. Thus, the Court finds that the statements made by officers describing these minor offenses are non-testimonial under *Crawford* and will be admitted into evidence subject to 18 U.S.C. § 3593(c).

 The government also seeks to introduce IDC reports discussing more serious offenses. For instance, the government seeks to introduce IDC reports that state that, in January 1980, Defendant Mills assaulted two correctional officers at USP Leavenworth. Specifically, the reports state that Mills punched these officers in the face. A prison inmate's assault on a prison officer is a serious offense, and one that is likely to lead to criminal prosecution. Thus, a statement regarding such an assault is made "under circumstances which would lead an objective witness reasonably to believe that [it] would be available for use at a later trial." *Id.* Indeed, Mills was prosecuted for these assaults, but the jury was unable to reach a unanimous verdict. Subsequently, the government dropped these charges. The government now seeks to introduce hearsay statements concerning the same alleged conduct that was put before a jury and not proven. Statements in the IDC reports concerning Mills's alleged assaults on prison officers in January 1980 are barred under *Crawford*.

Other IDC reports allege that Mills attempted to introduce cyanide into USP Marion on several occasions in 1987 and 1988. These reports have statements by Federal Bureau of Investigation officials who intercepted envelopes addressed to Mills that contained a white substance that was later found to be cyanide. These statements concerning this almost outrageous scheme to smuggle cyanide into the

1138

federal penitentiary are clearly "testimonial" under *Crawford. See id.* Therefore, these reports are inadmissible. After the Court's tentative ruling on this evidence, the government made efforts and was successful in finding witnesses to testify about the envelopes containing cyanide. Thus, the jury will be presented with testimony concerning Mills's alleged plot to smuggle cyanide into USP Marion.

The government also seeks to introduce internal prison memoranda alleging that Mills stabbed and murdered inmate Berry in California's San Quentin prison in April 1977. These memoranda are based on interviews with *unidentified* inmate witnesses and statements by prison officers. The memoranda state that the Marin County district attorney's office did not prosecute the matter because of insufficient evidence. The district attorney's office is quoted as stating that "[i]f at some later point in time additional evidence is discovered, or if the confidential informants who refuse to come forward and testify, change their minds and are willing to testify, we will be happy to re-evaluate this."

Now, the government seeks to place these allegations, which the district attorney's office previously rejected, before the present jury. The government is not attempting to present these allegations by placing the unnamed jailhouse informant on the stand, complete with his lengthy prison term for egregious conduct, multiple prior convictions, and inducements to testify. Instead, the government will likely place an appealing prison official on the stand who will, with his professional demeanor and authority, transfer his credibility to the "snitch" and thereby serve as a buffer to insulate the jury from the less-than-appealing aspects of the informant. In such a scenario, Defendant Mills will be unable to attack his accuser's credibility on

cross-examination, as he did to the government's witnesses during the guilt phase of the trial. This procedure violates the fundamental right to cross-examination that American jurisprudence has traditionally relied upon to bring forth the truth.

▉ The Sixth Amendment does not allow such admission of uncharged murders to prove a non-statutory aggravating factor. Statements in these memoranda, which accuse Mills of murdering another inmate by stabbing the inmate in the chest and face were made without question "under circumstances which would lead an objective witness reasonably to believe that [it] would be available for use at a later trial." *Id.* Therefore, these memoranda are inadmissible in the selection phase to prove future dangerousness.

▉ Another piece of evidence offered by the government is the grand jury testimony of a deceased witness who stated that Mills ordered him to murder another inmate in 1980. Specifically, the government seeks to offer the transcript of Sonny Burkett telling the grand jury that Mills ordered him to murder Robert Hogan so that Hogan could not recant his confession to the Marzloff murder. This testimony contradicts Burkett's testimony at trial when he was prosecuted for the Hogan murder. This is precisely the type of un-cross-examined accusatory testimony that the Sixth Amendment protects against. Grand jury testimony falls within the "core class of 'testimonial' statements" under *Crawford,* because a defendant has no opportunity to confront a witness who testifies before the grand jury. Instead, this evidence is inadmissible in the selection phase to prove the non-statutory aggravating factor of future dangerousness. *See Jensen,* 439 F.3d at 1089.

Although the Court excludes testimonial evidence under *Crawford,* much of the documentary evidence submitted by the gov-

ernment will be presented to the jury because it does not raise Confrontation Clause concerns. For instance, prison records setting forth Defendants' convictions for various crimes—including Mills's conviction for armed bank robbery and Bingham's convictions for the sale of heroin and an escape from confinement—are not barred by *Crawford.*

The Court also emphasizes that these rulings would be the same even if *Crawford* did not apply to the eligibility and selection phases. The documents containing allegations of serious offenses, such as assaulting a prison guard and the *uncharged* murder of another inmate, would be inadmissible under 18 U.S.C. § 3593(c) because their probative value on the issue of future dangerousness is outweighed by the prejudicial danger that the jury would assume that Defendant Mills actually committed the crimes. Thus, fears that *Crawford* would be applied so broadly as to devastate the government's ability to prove its case in the penalty phase seem unfounded. In reality, *Crawford* simply provides a principled rule to bolster discretionary tools that were already within the hands of the trial courts. The whims and inconsistencies of discretionary balancing under 18 U.S.C. § 3593(c) should never supplant constitutional rights.

■ Finally, while only Defendants Mills and Bingham—and not the government—hold the right to confront witnesses, the Court will not allow them to use the right to confrontation as a sword instead of a shield. If Defendants seek to introduce only select portions of testimonial evidence that are favorable to their defense, under a rule of completeness, the Court may, in its discretion under 18 U.S.C. § 3593(c), allow the government to submit related testimonial evidence so that the evidence is not misleading or confusing to the jury.

## IV. No Independent Burden of Proof for Unadjudicated Criminal Acts Offered as Proof of Non–Statutory Aggravating Factor of Future Dangerousness

The Court next considers whether prior, unadjudicated criminal acts, which the government offers as proof of the non-statutory aggravating factor of future dangerousness, should be subject to an independent burden of proof. The Court agrees with the reasoning in the case cited by the government that no such independent burden of proof is applicable. *See United States v. Beckford,* 964 F.Supp. 993 (E.D.Va.1997). *Beckford* followed "[n]umerous other district courts and courts of appeals [in holding] that unadjudicated criminal acts are not *per se* inadmissible." *Id.* at 999. After reviewing the relevant authority regarding the "eligibility" and "selection" aspects of capital sentencing, *Beckford* declined to impose a burden of beyond a reasonable doubt, or clear and convincing evidence for individual acts of unadjudicated criminal conduct offered to prove future dangerousness. *Id.* at 1006–07. Only the actual factor—future dangerousness—would be subject to proof beyond reasonable doubt because only that factor would be weighed by the jury.

Instead, the *Beckford* court found that prior unadjudicated criminal conduct could be admissible provided that it is "reliable." Further, the court found the evidentiary standard in 21 U.S.C. § 848(e)—which is identical to that in 18 U.S.C. § 3593(c)—is a sufficient measure of that reliability. *Beckford,* 964 F.Supp. at 1002. The court agreed that it would be proper to review the government's evidence prior to the penalty phase in order to assess that standard.

■ The Court finds the approach laid out in *Beckford* to be well-reasoned and

persuasive. Thus, the Court concludes that evidence of unadjudicated criminal acts will be admissible provided that it is reliable, i.e., so long as the government can show the evidence is probative of Defendants' future dangerousness, and that the value afforded to that determination is not outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury. *See* 18 U.S.C. § 3593(c).

## V. DISPOSITION

With its verdict of guilty, the jury has only two sentencing options: life without the possibility of release or death. Death is fundamentally different from all other forms of punishment. Because the death penalty is uniquely different in its finality and severity, increased scrutiny is required at every step of the capital process to ensure that death is the appropriate penalty. Capital jurisprudence has traveled far from the time when death was automatic. This Court's holding is in line with maturing federal death penalty jurisprudence and its recognition of the need for increased reliability in capital sentencing.

The Court hereby orders that Defendants Mills and Bingham shall be afforded their Sixth Amendment right to confront witnesses throughout the penalty phase of the trial and that the Court will not apply an independent burden of proof for unadjudicated criminal acts offered to prove the non-statutory aggravating factor of future dangerousness.

IT IS SO ORDERED.