BENAVIDES, Circuit Judge,
dissenting from Part II.A.1 and dissenting, in part, from the judgment:
The value of confrontation is never more vivid than when the state puts a defendant *363 to death based on testimony he had no opportunity to challenge. This was appreciated more than two-thousand years ago, when the Roman Governor Festus declared, “It is not the manner of the Romans to deliver any man up to die before the accused has met his accusers face to face.” Coy v. Iowa, 487 U.S. 1012, 1015, 108 S.Ct. 2798, 101 L.Ed.2d 857 (1988) (quoting Acts 25:16). Today, the majority announces that when it comes to putting defendants to death, “We are no Romans.”
Sherman Lamont Fields was sentenced to death based on adverse testimony he never had an opportunity to confront. That is all I need to know to find that the Confrontation Clause has been offended. The majority places undue emphasis on the artificial distinction between eligibility and selection factors at capital sentencing, and completely neglects to consider recent developments in the Sixth Amendment as to confrontation and sentencing.
When a jury cannot practically hand down a death sentence without finding certain facts, testimony as to those facts must be tested through confrontation. I would find that confrontation rights extend to FDPA capital sentencing, that those rights were violated below, and that resentencing is required.

I. The Confrontation Clause Applies at Capital Sentencing

Confrontation Clause analysis today bears little resemblance to its former self. It has changed significantly in the past few years. See Davis v. Washington, — U.S. -, 126 S.Ct. 2266, 2273-74, 165 L.Ed.2d 224 (2006); Crawford, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). One of the few areas undergoing a similarly drastic transformation is criminal sentencing. See United States v. Booker, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005); Blakely v. Washington, 542 U.S. 961, 125 S.Ct. 21, 159 L.Ed.2d 851 (2004). It should come as no surprise, then, that when courts are now asked to articulate how these two reconceptualized areas of law intersect — especially with regard to capital sentencing — disagreement abounds.
The persuasive authorities, and our Sister Circuits in particular, are divided on the issue sub judice.[1] A recent panel of *364 this Court recently presumed that the Confrontation Clause applies at capital sentencing, but did so without explicitly holding so. Coble v. Dretke, 444 F.3d 345, 353-54 (5th Cir.2006). After a thorough consideration of constitutional text, history, structure, and precedent, I would find that the Confrontation Clause applies with full force to capital sentencing under the Federal Death Penalty Act (“FDPA”).

A. Williams v. New York Is Not Controlling

No Supreme Court opinion has directly addressed whether the Confrontation Clause applies to capital sentencing. Even if one had, it would surely have been called into question by the Supreme Court’s recent Confrontation Clause and sentencing cases. It is therefore somewhat surprising that the majority relies so heavily on Williams v. New York, a due process case decided nearly sixty years ago that has been repeatedly limited by subsequent cases.
Williamsw&s a capital case that held the Due Process Clause did not “render[] a sentence void merely because a judge gets additional out-of-court information to assist him in [sentencing].” 337 U.S. 241, 252, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949). In United States v. Hall, this Court addressed Williams in light of a Confrontation Clause challenge to FDPA sentencing. 152 F.3d 381, 405-06 (5th Cir.1998). In Hall, we assumed without deciding “that the Confrontation Clause applies to the sentencing phase of a capital trial with the same force with which it applies during the guilt phase.” Id. In so doing, we noted this as an undecided issue and expressed doubt that Williams resolved it:
[I]t is significant that in Williams the Court addressed a due process challenge under the Fourteenth Amendment. The Court did not hold that the Sixth Amendment right to confrontation applied to the states via the Fourteenth Amendment’s Due Process Clause until over fifteen years after Williams was decided. It is thus quite questionable whether Williams is controlling with respect to the determination of whether the Sixth Amendment right to confrontation extends to capital sentencing hearings.
Id. at n. 13 (internal citations omitted); see also note 48, infra. Williams’s authority on this basis is frequently doubted.[2]
*365 While there was severe doubt as to Williams’s vitality a decade ago, the Supreme Court’s overhaul of the Confrontation Clause, see Crawford, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177, and the “sea change in the body of sentencing law” since then have made Williams even less informative to the question we face today. See United States v. Pineiro, 377 F.3d 464, 468-69 (5th Cir.2004), vacated, 543 U.S. 1101, 125 S.Ct. 1003, 160 L.Ed.2d 1006 (2005). Wdiile Williams may have some enduring value with regard to the introduction of nontestimonial hearsay at sentencing, testimonial hearsay requires separate treatment.[3]

B. Crawford and Apprendi Render Williams Inapplicable

Williams was based on two antiquated premises that have since been rejected by the Supreme Court:[4] (1) the Confrontation Clause is just a constitutional rule against hearsay, inextricable from the rules of evidence, and (2) the capital trial and sentencing are fundamentally different procedures that give rise to entirely different eviden-tiary concerns.

1. The Confrontation Clause Distinguished from the Rules of Evidence

Crawford explicitly rejected the former premise, holding that the Confrontation Clause was not dependent on “the vagaries of the rules of evidence.” 541 U.S. at 61, 124 S.Ct. 1354. The Confrontation Clause and the rules of evidence offer entirely separate protections. Conforming to evi-dentiary rules regarding hearsay will not satisfy the Confrontation Clause. Id. at 61-62, 124 S.Ct. 1354. Likewise, if a hearsay statement is not testimonial, the Confrontation Clause offers no protection. Davis, 126 S.Ct. at 2273.
With that understanding, Williams applies only to nontestimonial hearsay. That “the rules of evidence applicable to the manner in which a judge may obtain information to guide him in the imposition of sentence,” Williams, 337 U.S. at 244, 69 S.Ct. 1079, are more relaxed than eviden-tiary rules at trial says nothing about the content of the Confrontation Clause. *366 Even if the rules of evidence have no application at sentencing in light of the FDPA’s “blanket exception to the hearsay rule,” United States v. Robinson, 367 F.3d 278, 292 (5th Cir.2004), that does nothing to preclude Confrontation Clause protections.
The majority falters by treating the rules of evidence in lockstep with the Confrontation Clause. It repeatedly fails to appreciate the distinction between testimonial and nontestimonial hearsay. For instance, at one point it states that “[i]n-cluded in the notion that information influencing a sentencing decision need not be introduced in open court is the idea that defendants have no confrontation right at that phase of a trial.” Of course, that is only true if the “information” happens to be testimony, but any other form of information introduced outside of open court— including nontestimonial hearsay- — raises no Confrontation Clause issues whatsoever.[5] All of the majority’s concerns about depriving the sentencing authority of a broad range of evidence are misplaced, since extending the Confrontation Clause to sentencing does not preclude the relaxation of the rules of evidence. It is limited to testimonial evidence, as that alone implicates the Confrontation Clause.
The majority’s reliance on Williams is a sort of pre-Crawford relic surfacing a few years too late to be defensible. While Williamsmay still render the rules of evidence non-binding at sentencing, it has no bearing on the Confrontation Clause as recently extracted from those rules by Crawford and Davis.

2. The Convergence of Trial and Capital Sentencing

Second, the notion that capital sentencing proceedings are fundamentally different from trials no longer prevails. That conception has been eroded by both the longstanding Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), line of cases, and the more recent Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), line. Ultimately, Williams provides little guidance because “[t]he bases of the Williams decision ... have been eroded as applied to capital cases.” United States v. Taveras, 424 F.Supp.2d 446, 457 (E.D.N.Y.2006).
Williams supposed that there was no “constitutional distinction” between capital sentencing and ordinary sentencing. 337 U.S. at 252, 69 S.Ct. 1079. Williams's, critical backdrop was a sentencing scheme characterized by informal procedures and extraordinary discretion, one in which “no federal constitutional objection would have been possible” even if a judge gave “no reason at all” for a death sentence. Id. These premises no longer hold true. As explored further below, the death penalty invokes unique sentencing concerns. See United States v. Brown, 441 F.3d 1330, 1361 n. 12 (11th Cir.2006) (explaining that the Confrontation Clause applies at capital sentencing because “death is different”), cert. denied, — U.S. -, 127 S.Ct. 1149, — L.Ed.2d - (2007). The Constitution requires more stringent substantive and procedural protections before that penalty may be imposed. See, e.g., Furman, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346.
Moreover, the more recent Appren-di/Ring/Blakely/Booker line of cases casts doubt on the majority’s repeated assumption that Williams plainly controls at ordinary sentencing. 530 U.S. 466, 120 S.Ct. *367 2348, 147 L.Ed.2d 435 (2000); 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002); 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004); 543 U.S. 220, 125 5.Ct. 738, 160 L.Ed.2d 621 (2005). While that statement would have been less troubling a decade ago,[6] I for one cannot turn a blind eye to the complexities the Crawford and Apprendi cases have layered onto this issue.
I agree that the Confrontation Clause typically will not apply at noncapital sentencing, so long as the sentencing facts apply to an indeterminate scheme and a judge has broad discretion in imposing the sentence. Only to that extent is Williams’s application plain. But the Supreme Court recently recognized that even noncapital sentencing is not always so different from trial proceedings, and if the sentencing facts “increase the prescribed range of penalties to which a criminal defendant is exposed” such that the sentencing fact is the “equivalent of an element of a greater offense than the one covered by the jury’s guilty verdict,” Apprendi, 530 U.S. at 490, 494, 120 S.Ct. 2348, then the Confrontation Clause should apply and Williams does not control even in the non-capital context.
Insofar as the sentencing fact is the equivalent of an element of the offense, Confrontation Clause protections logically apply at sentencing. See United States v. Mills, 446 F.Supp.2d 1115 (C.D.Cal.2006); United States v. Gray, 362 F.Supp.2d 714, 725 (S.D.W.Va.2005); see also Michael S. Pardo, Confrontation Clause Implications of Constitutional Sentencing Options, 18 Fed. Sent. R. 230 (April, 2006). Even the Seventh Circuit, the only circuit to agree with the majority’s holding here, recognizes that “the Confrontation Clause applies during those portions of a sentencing proceeding that can lead to an increase in the maximum lawful punishment.” See Szabo v. Walls, 313 F.3d 392, 398 (7th Cir.2002) (citing Specht v. Patterson, 386 U.S. 605, 87 S.Ct. 1209, 18 L.Ed.2d 326 (1967)).
The majority is quick to point out that the contested testimony in this case applied only to selection factors, as opposed to eligibility factors. It finds that “[t]he establishment of nonstatutory aggravating factors is neither necessary nor sufficient to authorize imposition of the death penalty.” But that artificial categorical approach to sentencing ignores the stark reality of this case; because the jury unanimously found seven mitigating factors in Fields’s favor — and a number of other mitigating factors were found without unanimity — it is without doubt that the death penalty would not have been imposed but for the establishment of aggravating factors at the selection phase. To state that those factors were not necessary to impose the death penalty requires the majority to turn a blind eye to the practical realities of capital sentencing.
While the majority attempts to describe the selection phase of FDPA sentencing as purely discretionary, a jury that finds a defendant death eligible “has not found all the facts which the law makes essential to the punishment.” Blakely v. Washington, 542 U.S. 296, 303-04, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004). The selection phase of the FDPA gives jurors significant dis *368 cretion, but that discretion is curbed by requiring that the jury first ascertain the presence of mitigating factors. Assuming that mitigating factors exist, as several did here, the jurors must also find beyond a reasonable doubt that aggravating factors exist sufficient to outweigh the mitigating factors. While the actual weighing of the factors is not a “finding of fact,” the existence of such factors is a “constitutionally significant factfinding” to which the Confrontation Clause must attach.[7]
This is especially evident when, as here, the jurors found many mitigating factors that, on any plausible account, were only outweighed by aggravating factors that existed beyond those required for an eligibility finding. In short, when a jury cannot practically hand down a death sentence without finding certain facts, testimony regarding those facts must be tested through confrontation.[8] If the government thinks it necessary to prove nonstatutory aggravating factors, then it should be required *369 to do so with the Confrontation Clause in tact.

C. The Sixth Amendment’s Text

Because Williams is inapplicable and no Supreme Court opinion is directly controlling, I turn to the Constitution’s text. The Confrontation Clause applies in “all criminal prosecutions.” U.S. Const. amend. VI. “If ‘plain meaning’ is the criterion, this is an easy ease. Surely no one would contend that sentencing is not a part, and a vital one, of a ‘criminal prosecution.’ ” Wise, 976 F.2d at 407 (Arnold, C.J., concurring in part and dissenting in part); cf. Robertson v. United States, 417 F.2d 440, 447 (5th Cir.1969) (en banc) (holding that the Confrontation Clause did not apply to proceedings before a draft board because such proceedings “are not stages in a criminal prosecution”).
This reading of the Sixth Amendment’s text accords with the Supreme Court’s Right to Counsel jurisprudence. The Supreme Court has held that sentencing is a critical stage of a criminal proceeding during which the Sixth Amendment’s right to counsel applies. See Mempa v. Rhay, 389 U.S. 128, 88 S.Ct. 254, 19 L.Ed.2d 336 (1967). The Sixth Amendment extends the rights both to counsel and to confrontation in “all criminal prosecutions,” suggesting that where one right applies, the other does too.[9] See United States v. Petty, 982 F.2d 1365, 1370-71 (9th Cir.1993) (Noonan, J., dissenting); cf. John H. Langbein, The ORIGINS of Adversary Criminal Trial 291 (2003) (hereinafter “Langbein, Origins”) (“Cross-examining prosecution witnesses was the primary task for which the judges admitted defense counsel to the felony trial.”) . The Sixth Amendment’s text, read in light of Mempa v. Rhay, suggests that the Confrontation Clause should apply. Finding the Confrontation Clause inapplicable at sentencing forces the same phrase, “criminal prosecutions,” to mean two different things depending on which clause it modifies. We should at least be wary of giving the text such a counterintuitive reading.
That jury sentencing is not required in capital cases does not undercut this reading. See Spaziano v. Florida, 468 U.S. 447, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984). The Jury Clause has a unique second limitation that does not apply to the Right to Counsel or the Confrontation Clause: only a jury “trial” is required. See U.S. Const. amend. VI. A jury is only required at trial, whereas both the Right to Counsel and the Confrontation Clause “apply more broadly to the whole ‘criminal prosecution,’ and thus to sentencing.” John G. Douglass, Confronting Death: Sixth Amendment Rights at Capital Sentencing, 105 Colum. L.Rev. 1967, 2009 (2005) (hereinafter “Confronting Death ”); see An Argument for Confrontation, supra note 44, at n. 70.
Standing alone, the majority points out that this textual argument may prove too much, for it would apply equally at noncap-ital sentencing. “It is well established in this circuit that a criminal defendant’s Sixth Amendment right of confrontation is sharply circumscribed in non-capital sentencing proceedings.”[10] Hall, 152 F.3d at *370 405. It is not the textual reading alone, however, which supports holding that the Confrontation Clause must apply to capital sentencing under the FDPA. As already mentioned, Crawford and Apprendi might lead to treating capital and noncapital cases differently, notes 49-50, supra, but four other considerations confirm that capital sentencing is unique when it comes to the Confrontation Clause: constitutional history, the trial-like nature of FDPA sentencing, the Supreme Court’s death-is-different jurisprudence, and precedent specifically invoking a right of confrontation in post -Furman capital sentencing cases.

D. History of Confrontation at Capital Sentencing

Setting aside for the moment the modern Supreme Court’s insistence that death is different, history distinguishes capital sentencing from ordinary sentencing when it comes to confrontation rights. See Confronting Death, supra, at 1974. At the time the Confrontation Clause was written, a capital trial was a single, unified proceeding at which both guilt and sentence were decided. The Framers knew nothing of capital sentencing proceedings separate from trial. See Wise, 976 F.2d 393, 407 (Arnold, C.J., concurring in part and dissenting in part). As Blackstone wrote, once a defendant was convicted of a capital crime, “the court must pronounce that judgment which the law has annexed to the crime .... ” 4 W. Blackstone, Commentaries on the Laws of England *376. For capital felonies, the common law made death the exclusive and mandatory sentence. See Woodson v. North Carolina, 428 U.S. 280, 289, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976).
Nonetheless, a form of capital sentencing existed at the Founding. Proceedings that purported to be trials often functioned as defacto sentencing hearings:
The jury’s power to mitigate sanctions profoundly affected the purpose of the criminal trial for those many offenses in which the jury might return a partial verdict. Only a small fraction of eighteenth-century criminal trials were genuinely contested inquiries into guilt or innocence. In many cases, perhaps most, the accused had been caught in the act or with the stolen goods or otherwise had no credible defense. To the extent that trial had a function in such cases beyond formalizing the inevitable conclusion of guilt, it was to decide the sanction.
Langbein, ORIGINS, supra, at 59. To avoid meting out death for theft, juries would “bring in larceny to be under the value of a twelvepence, when it [was] really of much greater value.” 4 W. Blaokstone, supra, *239. Additionally, the “murkiness” of the common law’s distinction between manslaughter and murder empowered the trial jury with de facto sentencing discretion in homicide cases. See Welsh S. White, Fact-Finding and the Death Penalty: the Scope of a Capital Defendant’s Right to Jury Trial, 65 Notre Dame L.Rev. 1, 7 — 11 (1989); Thomas A. Green, The Jury and the English Law of Homicide, 1200-1600, 74 MiCH. L.Rev. 413, 424-25 (1976). The Supreme Court has recognized the Colonial jury’s practice of preventing death sentences by rendering factually dubious verdicts. See Woodson, 428 U.S. at 289-91, 96 S.Ct. 2978.
The critical point is this: because these de facto capital sentencing proceedings took the form of full criminal trials, the *371 defendant possessed full trial rights of confrontation. However, the notion that capital sentencing might be conducted “outside of an adversarial trial” is strictly a “post-constitutional” phenomenon. Confronting Death, supra, at 2016.
The majority reads this history selectively, treating the “sentencing authority’s [newfound] ability to select a lesser punishment in a capital case in spite of death-eligibility” as just an added layer of protection for the defendant. The majority paints the selection phase of capital sentencing as little more than a mercy hearing, where a defendant condemned to the gallows should be grateful just to have a chance to plead his case, no matter how limited the forum.
This picture does not accurately depict the FDPA’s sentencing procedures. The selection phase requires very specific factual and evaluative findings before the death penalty can be imposed. See note 49, supra. Defendants maintained confrontation rights when the critically important question of “life or death”[11] was posed to juries historically, and today we take that right away from them.
Another important point is that noncapi-tal sentencing has a different history. Early English and American cases suggest that judges conducted noncapital sentencing in informal proceedings featuring testimonial hearsay. Id. at 2016 & nn. 282-83. In Rex v. Sharpness, for example, the court allowed the prosecutor to read an aggravating affidavit before sentencing the defendant to one month of imprisonment on the crime of “suffering a prisoner to escape.” 99 ENG. Rep. 1066, 1066 (K.B. 1786). Similarly, State v. Smith held that the defendant could present a sentencing court with mitigating affidavits to show that he deserved a reduced sentence for assault and battery. 2 S.C.L. (2 Bay) 62,62 (1796).
History supports constraining confrontation rights in noncapital sentencing, but capital sentencing has a different history that suggests the Confrontation Clause should apply.

E. “Trial-like” Proceedings and Sixth Amendment Structure

The Confrontation Clause should apply fully because FDPA sentencing, unlike noncapital sentencing, involves a trial-like adversarial proceeding. The Supreme Court applies certain “trial rights” to adversarial sentencing hearings that bear the “hallmarks of the trial on guilt or innocence.” Bullington v. Missouri, 451 U.S. 430, 438-39 & n. 10, 101 S.Ct. 1852, 68 L.Ed.2d 270 (1981) (relying on trial-like format of Missouri’s capital sentencing hearing — which provided for opening statements, formal testimony, jury instructions, proof beyond a reasonable doubt of aggravating factors, final arguments, and a formal jury verdict — in holding that the Double Jeopardy Clause applied to the proceeding); see Morgan v. Illinois, 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992).
Strickland v. Washington, for example, refused to distinguish Florida’s capital sentencing from trial where effective assistance of counsel was concerned. The Court reasoned that Florida’s death penalty statute created a sentencing proceeding “like a trial in its adversarial format and in the existence of standards for decision.” Strickland, 466 U.S. 668, 686-87, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Thus, the Court held that the Right to Counsel must *372 apply fully to “ensure that the adversarial testing process works to produce a just result under the standards governing decision.” Id. at 687, 104 S.Ct. 2052.
This jurisprudence reflects structural reasoning and suggests that adversarial rights are “interdependent.”[12] See Confronting Death, supra, at 1975. The adversarial system is indeed a system, and its elements may not function effectively alone.
The FDPA, like many death penalty statutes, supplies adversarial sentencing hearings that resemble trials. See Thompson v. Oklahoma, 487 U.S. 815, 856, 108 S.Ct. 2687, 101 L.Ed.2d 702 (O’Connor, J., concurring in the judgment) (“As a practical matter we have virtually required that the death penalty be imposed only when a guilty verdict has been followed by separate trial-like sentencing proceedings, and we have extended many of the procedural restrictions applicable during criminal trials into these proceedings.”) The FDPA provides for jury sentencing.[13] 18 U.S.C. § 3593(b). In addition, hearings under the FDPA bear other hallmarks of a criminal trial. Both sides are represented by counsel and present evidence; the Court instructs the jury; the Government, and then defense counsel, presents closing argument; the Government must prove aggravating factors beyond a reasonable doubt; the jury returns a formal verdict, and its verdict must be unanimous. See id.
Requiring confrontation in the FDPA’s trial-like sentencing regime is particularly appropriate given the interdependence of adversarial rights. See Edmund M. Morgan, The Jury and the Exclusionary Rules of Evidence, 4 U. Chi. L.Rev. 247, 255 (1936) (arguing that the right to “cross-examine is an essential element” of any adversarial system). If capital sentencing purports to provide a full-fledged adversarial proceeding, then a true adversarial proceeding it must give. See Christopher K. Tahbaz, Note, Fairness to the End: The Right to Confront Adverse Witnesses in Capital Sentencing Proceedings, 89 Colum. L.Rev. 1345, 1368 (1989) (“Because *373 the right of confrontation is fundamental to the adversarial process, it should be extended to capital sentencing procedures”); cf. Morgan, 504 U.S. at 727, 112 S.Ct. 2222 (holding that “if a jury is to be provided the defendant [at capital sentencing], regardless of whether the Sixth Amendment requires it, the jury must stand impartial and indifferent to the extent commanded by the Sixth Amendment”).
In particular, a meaningful Right to Counsel at capital sentencing depends on confrontation rights. The Confrontation Clause should apply to protect the Right to Counsel in death penalty proceedings. See Herring v. New York, 422 U.S. 853, 857, 95 S.Ct. 2550, 45 L.Ed.2d 593 (1975) (“[T]he right to assistance of counsel has been understood to mean that there can be no restrictions upon the function of counsel in defending a criminal prosecution in accord with the traditions of the adversary factfinding process that has been constitu-tionalized in the Sixth and Fourteenth Amendments.”).
Professor Douglass explains:
Sixth Amendment rights support each other. Without counsel, the right of cross-examination may be an exercise in futility. Without the right to cross-examine the state’s witnesses or to present favorable evidence, the right to counsel may be an empty formalism.
Confronting Death, supra, at 2010. Douglass wonders what use the Right to Counsel would be at capital sentencing if Government witnesses were permitted “to answer the prosecutor’s questions and then walk away before the defense counsel had an opportunity to probe.” Id. at 1982; see also Petty, 982 F.2d at 1371 (Noonan, J., dissenting) (“What is the point of having counsel if counsel cannot exercise an essential function of counsel— the cross-examination of the witnesses against counsel’s client?”).[14]
The Confrontation Clause should apply at capital sentencing to ensure (1) that the “trial-like” “adversarial testing process” provided under the FDPA “works to produce a just result” and (2) that the Right to Counsel, in particular, functions effectively in capital cases. See Strickland, 466 U.S. at 687, 104 S.Ct. 2052.

F. Death is Different

The Eleventh Circuit applied the Confrontation Clause on the ground that the death penalty demands special procedures to assure reliability. See Proffitt, 685 F.2d at 1253-54. There is extensive and persuasive support for this position.
The stringent, “trial-like” procedures that govern capital sentencing derive from the Supreme Court’s unique concern with reliability in death penalty cases. “In capital proceedings generally, th[e] Court has demanded that factfinding procedures aspire to a heightened standard of reliability. This especial concern is a natural consequence of the knowledge that execution is the most irremediable and unfathomable of penalties; that death is different.” Ford v. Wainwright, 477 U.S. 399, 411, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986) (internal citations omitted).
Confrontation is essential to reliability. Courts have repeatedly recognized cross-examination as “the greatest legal engine ever invented for the discovery of truth.” *374 E.g., White v. Illinois, 502 U.S. 346, 356, 112 S.Ct. 736, 116 L.Ed.2d 848 (1992). “ ‘Cross-examination is the principal means by which the believability of a witness and the truth of this testimony are tested.’” Wilkerson v. Cain, 233 F.3d 886, 890 (5th Cir.2000) (quoting Davis v. Alaska, 415 U.S. 308, 316, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974)). The Supreme Court in Crawford maintained that “the [Confrontation] Clause’s ultimate goal is to ensure reliability of evidence.” 541 U.S. at 61, 124 S.Ct. 1354. The Confrontation Clause should apply to capital sentencing because those proceedings must aspire to greater reliability than ordinary sentencing.
The majority resists this logic. Citing Gregg v. Georgia,[15] it contends that allowing testimonial hearsay is necessary because the capital “sentencing authority must consult a broader range of considerations in deciding just punishment than a trial jury in deciding guilt.” Thus, a sentencing jury may properly consider victim impact evidence, see Payne v. Tennessee, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991), and a sentencing judge in a capital case can take into account “the elements of racial hatred” involved in a murder. Barclay v. Florida, 463 U.S. 939, 949, 103 S.Ct. 3418, 77 L.Ed.2d 1134 (1983). But the majority’s argument is twice flawed.
First, applying the Confrontation Clause is consistent with this line of cases because it does not restrict the type of facts that may be proven at capital sentencing. Rather, it only affects the way that they may be proven. “Where a hearsay declar-ant is available to testify, Crawford merely requires the government to present that information in a different, albeit less convenient, form: through the live testimony of the witness with direct knowledge of the facts.” Confronting Death, supra, at 2027; see Porter v. State, 578 S.W.2d 742, 748 (Tex.Crim.App.1979) (“While the facts contained in the documents in question may have been relevant to the punishment, the manner in which the State sought to prove those facts denied appellant his constitutional rights of confrontation and cross-examination.”).
Second, it is far from clear that applying the Confrontation Clause would result in “less evidence.” In some cases, excluding testimonial hearsay may result in the loss of relevant information. When witnesses are available to testify, however, the jury will have the benefit of additional information developed on cross-examination. Therefore, applying the Confrontation Clause at capital sentencing is consistent with Gregg and reflects the Court’s emphasis on increased reliability.
The majority’s rule does not necessarily allow more information to come into capital sentencing, it merely admits one-sided evidence without any meaningful challenge.

G. Cases Suggesting Confrontation Clause Rights

A number of cases that specifically invoke a right of confrontation in capital sentencing bolster this position. Although none definitively establish a full right of confrontation, these post-Furman cases provide far better guidance than Williams v. New York.
In Gardner v. Florida, the Supreme Court reversed a death sentence which was based in part on secret information not disclosed to the defense. 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977). The Gardner plurality cast doubt on the authority of Williams. It emphasized how capital sentencing had changed in the in *375 tervening years and stated that the “passage of time justifies a re-examination of capital-sentencing procedures.” Id. at 356-57, 97 S.Ct. 1197. Accordingly, Gardner limited Williams, stressing that the case had addressed a “ ‘narrow contention ... relating] to the rules of evidence applicable’ ” to sentencing. Id. at 355, 97 S.Ct. 1197 (brackets in original).[16] Gardner then distinguished Williams on several grounds, noting as significant that the trial judge in Williams was not asked to “ ‘afford appellant a chance to refute or discredit any of [the statements at issue] by cross-examination or otherwise.’ ” Id. at 356, 97 S.Ct. 1197 (quoting Williams, 337 U.S. at 244, 69 S.Ct. 1079) (emphasis added). Reasoning that “debate between adversaries is often essential to the truth-seeking function,” the Court then held that due process mandated that the defense be able to “deny or explain” evidence used in capital sentencing. Id. at 360-62, 97 S.Ct. 1197.
Two years later, in Estelle v. Smith, this Court considered the scope of Gardner. 602 F.2d 694 (5th Cir.1979), aff'd by Estelle v. Smith, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981). In Smith, the prosecution omitted from its witness list the name of a psychiatrist whose testimony on the issue of future dangerousness was crucial to its case at the penalty phase. This Court held that allowing a surprise witness violated the principles of Gardner in part because it undermined the defendant’s “right to effective cross-examination.” Id. at 698 n. 3. The Smith Court’s notation of a right to effectively cross examine was not an isolated slip of the pen. Smith refers to the need for effective cross-examination in capital sentencing four separate times. Connecting its holding to the Supreme Court’s death-is-different jurisprudence, Smith opined that testimony not effectively cross-examined “carries no assurance of reliability whatever.” Id. at 701. The Eleventh Circuit relied in part on our Smith decision to hold that the Confrontation Clause applies to capital sentencing. See Proffitt, 685 F.2d at 1254-55 (“The reasoning in Smith clearly supports the view that the right to cross-examine adverse witnesses applies to capital sentencing proceedings, at least where necessary to ensure the reliability of the witnesses’ testimony.”).
Contrary to the panel opinion, the ability to cross-examine a witness who presents hearsay testimony does not satisfy Smith’s requirements. That is a very thin view of what constitutes a “right to effective cross-examination.” 602 F.2d at 698 n. 3. Cross-examination would serve very little purpose if a defendant is allowed to cross-examine, not the accuser, but a person who reads the accuser’s statement. The state could effectively insulate all of its adverse testimony by having witnesses write their statements out and then putting an officer on the stand to read them. While that officer may then be questioned, his answers may logistically be confined to confirming or denying what a piece of paper says, leaving the substantive accusation *376 and its source’s credibility and motive completely untested. That is essentially what the state did in this case with Detective January.
Finally, the Supreme Court’s reasoning in Barefoot v. Estelle presupposes the existence of confrontation rights at capital sentencing. See 463 U.S. 880, 902-03, 103 S.Ct. 3383, 77 L.Ed.2d 1090 (1983). Barefoot held that the Due Process Clause did not require psychiatric future-dangerousness testimony to be excluded from capital sentencing. Acknowledging the problems with such testimony, the Court stated that the defendant would have “the benefit of cross examination” to expose its flaws. Id. at 898-99, 103 S.Ct. 3383.
Text, history, structure and precedent favor applying the Confrontation Clause with full force to capital sentencing. While Williams may still guide application of the rules of evidence at capital sentencing, the Confrontation Clause has been given new force, and it is unfortunate that the majority takes that force away at a time when it is most needed. It is clear to me, and I would hold that when a jury cannot plausibly hand down a death sentence without finding certain facts, those facts can only be found with the Confrontation Clause’s protections.

II. Testimonial Statements Wrongfully Admitted

Having found that the Confrontation Clause has some application to capital sentencing, I would turn to the challenged statements to determine whether their admission violated Fields’s confrontation rights. In Crawford, the Supreme Court held that the Confrontation Clause bars “admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination.” 541 U.S. 36, 53-54, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). Crawford did not draw finely the line between testimonial and nontestimonial statements. It did note, however, that “[statements taken by police officers in the course of interrogations” would qualify “under any definition” of testimonial. Id. at 52, 124 S.Ct. 1354.
Recently, the Court began marking the bounds of this Crawford subcategory: Statements made in the course of police interrogation “are testimonial when the circumstances objectively indicate that there is no ... ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.” Davis, 126 S.Ct. at 2273-74.[17] This rule suffices to resolve two of Fields’s Crawford challenges.

A. Hearsay Witnesses to the King Shooting

Fields argues that he was denied confrontation rights when, over his objection, police officers were permitted to relate out-of-court statements to establish that Fields committed prior violent crimes. These challenges are reviewed de novo. See United States v. Rueda-Rivera, 396 F.3d 678, 680 (5th Cir.2005).

1. Detective January’s Testimony

At Fields’s sentencing hearing, the Government called Steve January, a Waco Police Department detective. January testified about a shooting he investigated in 2000. When the prosecution asked whether January “talked to witnesses” after re *377 sponding to the incident, Fields objected under the Confrontation Clause. After the district court overruled the objection, January testified based on “a cumulation of stories from different persons” and the statements of “at least five people” who the responding officers actually interviewed. According to January, these stories and statements implicated Fields in the shooting of a man named Ladon King. January testified that some of the witnesses he had interviewed saw the defendant shoot at King.
Based on January’s investigation at the crime scene, the Government sought to paint “a picture in [the jury’s] mind” about what Fields was doing during this shootout. January testified that his investigation showed that Fields and' an accomplice cornered Kang in the courtyard of an apartment complex. He further testified that “Fields had driven a vehicle around and [began] firing a weapon through the southeast corner.” Fields’s accomplice was firing from an opposite corner, and King “was kind of caught in a cross-fire.” According to January, King was hit and sustained serious injuries that required surgery. Specifically, he had suffered “a punctured lung.”
January also testified about his interview of King, which took place in the intensive care unit of a hospital the day after the shooting. Although King was lucid enough to be interviewed, “he couldn’t speak words very well without grimacing in pain.” According to January, he showed King a photo lineup to see if King could pick out the men who shot him. January said King whispered that Fields fired the shot that hit him in the upper torso: “[King] pulled me close ... and told me that [Fields is] the one that shot [him].”

2. Application of Davis/Hammon

Under the Supreme Court’s recent decisions in Davis v. Washington and Ham-mon v. Indiana,[18] the statements related by January at Fields’s sentencing were testimonial hearsay.[19] Both the eyewitness statements and King’s statements from the intensive care unit bear substantial similarity to the testimonial statements in the Hammon case. For instance, all of the statements related by January were given in response to police questioning. See Davis, 126 S.Ct. at 2278. As in Ham-mon, all deliberately narrated past criminal events. See id. The declarants here, like in Hammon, were interviewed away from the defendant, Fields.
Additionally, the statements at issue are substantially different from those the Supreme Court found nontestimonial in Davis. In Davis, the Court found nontes-timonial statements given to a 911 operator for the purpose of resolving a present emergency. See id. at 2276. January’s testimony indicated that he was not addressing an “emergency in progress” but instead was conducting a criminal investigation. See id. As to the crime scene investigation, January testified that he responded after the victim of the shooting “had left that location by private vehicle.” January never testified that he or any other responding officer heard gunfire. Compare id. at 2278 (“[T]he interrogating officer [in Hammon] testified that he heard no arguments or crashing and saw no one throw or break anything.”) Moreover, in conjunction with interviewing witnesses, January and the other responding *378 officers looked for physical evidence, ultimately collecting “a number of shell casings” and a bullet.
As to King’s identification of Fields, that was given to January from a hospital room a day after the incident. See id. at 2276 (noting that the statements found testimonial in Crawford “took place hours after the events [the declarant] described”). These circumstances show January was conducting a criminal investigation, as he himself testified repeatedly. He “was not seeking to determine ‘what is happening,’ but rather ‘what happened.’ ” Id. at 2278.
Furthermore, under Davis/Hammon, it is not critical that the interrogations occurred in an arguably informal setting. The majority in Davis/Hammon pointedly rejected the dissent’s approach, which would have limited testimonial statements to those given under circumstances “sufficiently formal to resemble the Marian examinations.”[20] Id. at 2284 (Thomas, J., dissenting). Instead, the majority held, “It imports sufficient formality ... that lies to [police] officers are criminal offenses.” Id. at 2278 n. 5.
The objective circumstances indicate that the primary purpose of the police questioning at issue was to “nail down the truth about past criminal events.” Id. at 2278. Thus, the statements given in response were testimonial. .The Government did not establish that the declarants were unavailable, and Fields had no opportunity to cross-examine them. Therefore, the introduction of the testimonial statements violated the Confrontation Clause. See Crawford, 541 U.S. at 53-54, 124 S.Ct. 1354.

3. The Crawford Violation Was Not Harmless

The Government contends that any Crawford error is harmless. “Confrontation Clause errors ... are subject to harmless-error analysis.” See Hall, 152 F.3d at 406. Since constitutional error is at issue, “[t]he burden of proof is on the Government to show that the error was harmless by proving beyond a reasonable doubt that the error did not contribute to the sentence received.” United States v. Garza, 448 F.3d 294, 301 (5th Cir.2006). In this case, the Government cannot meet that “arduous burden.” United States v. Pineiro, 410 F.3d 282, 284-87 (5th Cir.2005).
January’s testimony was significant evidence. It was the only evidence showing that Fields participated in the King shooting. The Government discussed the incident at closing as part of its contention that Fields previously had “participated in attempted murders and other serious acts of violence,” which it had alleged as a nonstatutory aggravating factor: “You also heard that [Fields] was released in July of 2000 ... and after that in approximately September he and [an accomplice] shot at Ladon King.” After listing several other incidents (some of which also were proven with unconfronted testimony[21]), the Government stated: “Those are the other attempted murders and other serious acts of violence, some of them, you heard the evidence on many, but those are the ones I want you to think about.”
*379 In addition, the Government used the King shooting in its rebuttal closing argument to counteract the defense’s case for impaired capacity. It argued that Fields had control over himself despite his tragic background: “He made choices along his whole life.” As an example, the Government pointed to the King shooting, stating that Fields “chose ... to go to an apartment complex with kids and people and have a shoot-out with another drug dealer.” More broadly, the Government’s case that Fields had a track record of serious violence was central to its case at sentencing. Fields’s participation in the attack January described provided substantial support for that theme.
The record indicates that the jury considered its sentencing decision to be a difficult one. After deliberating for six hours, the jurors sent the district court a note inquiring what sentence would be imposed if they could not agree. Later, the jury sent another note stating flatly, “We cannot come to a unanimous agreement.” Only after the court instructed the jury to continue deliberating did it return a death verdict.
Courts often have been unwilling to find error harmless where the record, as in this case, affirmatively shows that the jurors struggled with their verdict. “The fact that a jury initially was deadlocked and reached a verdict only after receiving an Allen charge may support an inference that the case was close.” United States v. Jean-Baptiste, 166 F.3d 102, 109 (2d Cir.1999); see also Powell v. Collins, 332 F.3d 376 (6th Cir.2003) (finding prejudice in part because, “at one point in its sentencing deliberations, the jury informed the court that it was ‘at a stalemate’ and could not agree whether to impose a death sentence”); United States v. Varoudakis, 233 F.3d 113, 127 (1st Cir.2000) (jurors’ note stating that they were “at an impasse” in their deliberations “reveal[ed] uncertainty about [the defendant’s] guilt” and “weighted] against a finding of harmless error”); Medina v. Barnes, 71 F.3d 363, 369 (10th Cir.1995) (holding that the jurors’ statement “at one point during their deliberations ... that they might be unable to reach a unanimous verdict” was a circumstance suggesting error was prejudicial). Reluctance to find harmless error despite a jury note indicating an impasse is especially appropriate here, on direct review, where the Government’s burden of proof is at its apex.
There are other indications that the sentencing issue was close. The jurors unanimously found a number of substantial mitigating factors, including that Fields (1) suffered physical abuse during his formative years, (2) suffered emotional abuse during his formative years, (3) suffered from parental neglect during his formative years, (4) was exposed to the violent deaths of family members, loved ones, and friends during his formative years, (5) lived most of his life without having a significant father figure, (6) is the product of an impoverished background which impaired or hampered his integration into the social and economic mainstream of society, and (7) spent significant periods of his life in solitary confinement.
Some jurors found other significant mitigating factors. Eleven jurors found, for example, that Fields’s behavioral problems may decrease over time and that a death sentence would cause emotional injury, harm, and loss to Fields’s family. Two jurors found that Fields committed his crime “under unusual and substantial duress.” One found that Fields had recently responded well to a structured environment and likely would adapt to prison life if he were sentenced to life imprisonment.
The Government maintains nonetheless that any error was harmless beyond a *380 reasonable doubt. It points to nontestimo-nial sentencing evidence showing that Fields was involved in numerous other violent and criminal incidents beyond the King shooting. While some of those extra incidents are significant, they do not eliminate reasonable doubts that the erroneously admitted testimony repeatedly stressed by the government regarding the King shooting tipped the scales for at least one of the jurors, thereby enabling a death sentence.
The Government’s proof of Fields’s involvement in the King shooting — which occurred much closer in time to Fields’s trial than his previous attempted murder — may have added significant weight to the death side of the scale. The Government has not shown beyond a reasonable doubt that the verdict would have been the same absent this added weight. Given that the Government emphasized the King shooting at closing, that the jury struggled to reach a verdict, and that it found significant mitigating factors, the testimonial hearsay related by January was not harmless. I would vacate Fields’s death sentence.

B. Additional Crawford Claims

Apart from the testimonial hearsay related to the King shooting, the government repeatedly relied on testimony to make its case for a death sentence. As just one example, a Killeen police officer, Daniel Tichenor, was allowed to testify based on witness reports that Fields was involved in an armed robbery, despite Fields’s objection that he should be allowed to confront the witnesses themselves. Tichenor testified that two alleged victims of an armed robbery contacted the police department in December 2000. According to Tichenor, “They indicated to the patrol officers that responded that they were robbed at gunpoint by two subjects,” one of whom “they identified as ... Sherman Fields.”
Tichenor testified to the details of the alleged crime based on what the victims said: “They indicated that they were in a car driving along with ... Fields” and an accomplice. “While driving down the street, [Fields’s accomplice] pulled out a gun, demanded money from both and the jewelry that both the two victims had with them. [He] fired a shot inside the car. Both subjects ended up giving their jewelry and money to Mr. Fields and [his accomplice] .... ” Tichenor also testified that Fields’s accomplice told Tichenor that he and Fields had driven from Waco to Killeen that day to buy $4500 in crack cocaine. Tichenor further stated that Fields’s accomplice admitted to firing a shot in the car in order to scare them.
The statements related by Tichenor are testimonial for the same reasons that the statements related by January are testimonial. The investigating police officers responded to do an after-the-fact criminal investigation. They were not addressing an ongoing emergency. The declarants described past criminal conduct to persons they knew were police officers. Finally, the record implies that the statements at issue were given in direct response to questioning.
This testimony, like Officer January’s, very well could have been the difference between life and death for Fields. Beyond Officer January’s and Tichenor’s testimony, the list goes on and on.[22]

*381
III. Conclusion

Sherman Lamont Fields was sentenced to death based on testimony that he was never able to confront. That is precisely the evil that the Confrontation Clause was meant to protect against. That troubling fact cannot be remedied by categorizing the testimony as speaking to selection as opposed to eligibility factors. The jury’s difficulty in agreeing on a sentence and the number of mitigating factors found highlight how artificial that distinction can be.
I would find that the Confrontation Clause applies to capital sentencing as it is structured under the FDPA and remand this case for resentencing.

. Compare Proffitt v. Wainwright, 685 F.2d 1227, 1254 (11th Cir.1982) (holding that "the right to cross-examine adverse witnesses applies to capital sentencing hearings”); United States v. Mills, 446 F.Supp.2d 1115, 1135 (C.D.Cal.2006) ("Crawford v. Washington’s protections apply to any proof of any aggravating factor during the penalty phase of a capital proceeding under the FDPA.”); Russeau v. State, 171 S.W.3d 871, 880 (Tex.Crim.App.2005) (reversing a death sentence under Crawford because the trial court admitted testimonial hearsay at the punishment phase), cert. denied, - U.S. -, 126 S.Ct. 2982, 165 L.Ed.2d 990 (2006), and cert. denied, - U.S. -, 126 S.Ct. 2982, 165 L.Ed.2d 989 (2006); State v. Bell, 359 N.C. 1, 603 S.E.2d 93, 115-16 (2004) (applying Crawford to hold that the introduction of testimonial hearsay at the sentencing phase of a capital trial violated the Confrontation Clause); and Rodriguez v. State, 753 So.2d 29, 43-44 (Fla.2000) (holding that "the Sixth Amendment right of confrontation applies to all three phases of the capital trial” and that "the admission of ... hearsay statements of co-defendants in the penalty phase violated the Confrontation Clause”) with Szabo v. Walls, 313 F.3d 392, 398 (7th Cir.2002) (holding that the Confrontation Clause "applies through the finding of guilt, but not to sentencing, even when that sentence is the death penalty”); State v. McGill, 213 Ariz. 147, 140 P.3d 930, 940-42 (2006) (Crawford does not apply to penalty phase of capital trial); State v. Stephenson, 195 S.W.3d 574, 590-91 (Tenn.2006) (same); United States v. Johnson, 378 F.Supp.2d 1051, 1062 (N.D.Iowa 2005) (holding that Crawford does not apply to sentence-selection phase of capital sentencing); and People v. Simms, 168 Ill.2d 176, 213 Ill.Dec. 576, 659 N.E.2d 922, 930 (1995) (rejecting Proffitt).
In a footnote in Proffitt, the Eleventh Circuit stated, "Our decision that the right of *364 cross-examination of adverse witnesses is extended to capital sentencing proceedings is necessarily limited to the facts of the case before us, involving psychiatric reports.” 706 F.2d 311, 312 (11th Cir.1983) (on petition for rehearing). However, both the Eleventh Circuit and this Court have since recognized that Proffitt stands for the general proposition that “the constitutional right to cross-examine witnesses applies to capital sentencing hearings.” United States v. Brown, 441 F.3d 1330, 1361 n. 12 (11th Cir.2006), cert. denied, — U.S. -, 127 S.Ct. 1149, — L.Ed.2d - (2007); see United States v. Hall, 152 F.3d 381 (5th Cir.1998).

. See United States v. Silverman, 976 F.2d 1502, 1525-26 (6th Cir.1992) (Merritt, C.J., dissenting) ("In 'Williams, ... the question was whether the Due Process Clause — not the Confrontation Clause — allowed the trial judge to use general hearsay information in the sentencing process.”); United States v. Wise, 976 F.2d 393, 408 (8th Cir.1992) (Arnold, C.J., concurring in part and dissenting in part) ("Williams ... is not a Confrontation Clause case at all. It is a due-process case from a state court, decided before the Confrontation Clause was held applicable to the states.”); Proffitt v. Wainwright, 685 F.2d 1227, 1253 (11th Cir.1982) (stating that, notwithstanding Williams, whether "the right to cross-examine adverse witnesses extends to capital sentencing proceedings has not been specifically addressed by the Supreme Court.”); see also Maynard v. Dixon, 943 F.2d 407, 414 n. 5 (4th Cir.1991) (discussing Willi-amsbut noting as unresolved the "fundamental question of whether the sixth amendment right of confrontation applies to all aspects of *365 the sentencing phase [of a capital trial]”); United States v. Kikumura, 918 F.2d 1084, 1103 n. 19 (3d Cir.1990) ("We hope ... that the Supreme Court in the near future will decide whether confrontation clause principles are applicable at sentencing hearings.”); Alan C. Michaels, Trial Rights at Sentencing, 81 N.C.L.Rev. 1771, 1837 (2003) ("[Williams] was decided on due process grounds alone, however, and was decided sixteen years before the Confrontation Clause was incorporated against the states.”); Note, An Argument for Confrontation Under the Federal Sentencing Guidelines, 105 Harv. L.Rev. 1880, 1890 (1992) (hereinafter "An Argument for Confrontation") (criticizing Courts of Appeals for failing to notice that "Williams was not a Confrontation Clause case”).

. The majority reasons that because the Supreme Court has previously analyzed hearsay admissibility at sentencing under the Due Process Clause, that somehow means the Due Process Clause — not the Confrontation Clause — is ordained as the relevant framework for such challenges. This reads far too much into Williamsand Specht v. Patterson, 386 U.S. 605, 87 S.Ct. 1209, 18 L.Ed.2d 326 (1967). In neither case did the appellant so much as mention the Confrontation Clause in its briefs and, accordingly, the Court did not consider it. The Court's failure to address unraised arguments hardly provides grounds for an implied holding. • This mistake might explain the majority’s repeated disregard for the distinction between nontestimonial and testimonial hearsay, inasmuch as that is a distinction only relevant to a Confrontation Clause inquiry.

. See Michael S. Pardo, Confrontation Clause Implications of Constitutional Sentencing Options, 18 Fed. Sent. R. 230 (April, 2006) (describing these premises and their inapplicability given recent cases).

. That is not to say that there are no concerns — since due process and statutory restrictions may still serve to exclude such evidence — -just that they are not Confrontation Clause concerns.

. The majority offers many permutations of this view: “caselaw definitively maintains the Williams principle in the noncapital context,” "the confrontation right [is] admittedly nonexistent at noncapital sentencing,” “it has already been established that the right of confrontation is nonexistent.”
While Williams has some application, its holding is limited to the rules of evidence as recently extracted from the Confrontation Clause, as explained above. It cannot be read for any broader holding than that.

. Perhaps my disagreement with the majority is based in how to classify the selection phase of FDPA sentencing. The Supreme Court has made clear that the aggravating factors required at the eligibility phase of FDPA sentencing are the equivalent of elements of the offense, and the Confrontation Clause would presumably attach at that phase since it is akin to a trial on the elements of the offense. See Ring v. Arizona, 536 U.S. 584, 609, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). This case concerns the selection phase of FDPA sentencing, where the jury must find any additional aggravating factors beyond a reasonable doubt, find mitigating factors by a preponderance of the evidence, and then must determine "whether all the aggravating factor or factors found to exist sufficiently outweigh all the mitigating factor or factors found to exist to justify a sentence of death.” 18 U.S.C. § 3593(e).
I think the majority offers a distorted description of the selection process as merely providing the jury the "ability to select a lesser punishment in a capital case in spite of death-eligibility,” as if it were nothing more than a mercy hearing. It is not nearly so discretionary, as it contemplates particularized additional findings from the jury regarding the existence of aggravating and mitigating factors. See John G. Douglass, Confronting Death: Sixth Amendment Rights at Capital Sentencing, 105 Colum. L.Rev. 1967, 1974-75 (2005) ("A defendant's right to cross-examine a crucial witness should not turn upon a legislature’s designation of eligibility factors and selection factors, an often artificial distinction that bears little relationship to the real issues affecting the choice between life and death.”).
But selection phase findings cannot be easily labeled as elements of the offense either, as the eligibility factors were found to be in Ring. Instead, we are faced with a hybrid finding that one court recently aptly labeled as "constitutionally significant factfinding.” Mills, 446 F.Supp.2d 1115, 1134. I agree with that court's finding that such constitutionally significant factfinding is more similar to eligibility findings than purely discretionary ones and thereby requires Confrontation Clause protections. Id. at 1134-35.
The FDPA's complicated and rigorous fact-finding requirements also distinguishes it from typical noncapital sentencing, answering the majority’s queries as to how my approach can be reconciled with the general rule that confrontation does not apply at sentencing. The FDPA simply requires more than the typical sentencing finding.

. I use the word "practically” because it is admittedly conceivable here — albeit highly improbable given the seven mitigating factors the jury unanimously found — that the jury would have imposed the death penalty without finding any aggravating factors beyond those establishing death eligibility. That chance cannot demean the practical significance of the additional aggravating factors that were raised against Fields without the protections of the Confrontation Clause. To place significant reliance on that possibility would be to exalt form over effect, as repeatedly warned against in the Court’s recent sentencing cases. If the prosecution believes the aggravating factors establishing death eligibility are alone sufficient to outweigh the mitigating factors, it is at liberty to proceed without proving the "unnecessary” additional aggravating factors and avoid the issues addressed here.

. In full, the Sixth Amendment provides, "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the state and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the assistance of counsel for his defense.”

. Notably, we did not rely on Williams in holding that a defendant's rights under the Confrontation Clause are "severely restrict *370 ed” in noncapital, Guideline sentencing proceedings. See United States v. Rodriguez, 897 F.2d 1324, 1328 (5th Cir.1990).

. “Life or death?” has a distinctly different tone and importance than, "death eligible, or not death eligible?”

. This does not imply that Confrontation Clause error is “structural error” in the technical sense of that phrase. “Confrontation Clause errors, like other trial errors, are subject to harmless-error analysis.” Hall, 152 F.3d at 406.

. See Robinson v. Polk, 438 F.3d 350, 359 (4th Cir.) (holding that the Confrontation Clause “appl[ies] equally to sentencing proceedings tried to a jury”), cert. denied, - U.S. -, 127 S.Ct. 514, 166 L.Ed.2d 383 (2006); Chaffin v. Stynchcombe, 412 U.S. 17, 28 n. 15, 93 S.Ct. 1977, 36 L.Ed.2d 714 (1973) (explaining that "the institution of jury sentencing is unlike judicial sentencing in a number of fundamental ways”); Mark Silver-stein, Confrontation at Capital Sentencing Hearings: Illinois Violates the Federal Constitution by Pennitting Juries to Sentence Defendants to Death on the Basis of Ordinarily Inadmissible Hearsay, 22 Loy. U. Chi L.J. 65, 74, 122 (1990) (hereinafter “Confrontation at Capital Sentencing Hearings ”) (arguing that Williams"discussed only judicial sentencing” and that the Supreme Court “has never indicated that it would extend Williams ... to a sentencing jury”); cf. United States v. Cardenas, 9 F.3d 1139, 1154-56 (5th Cir.1993) (en banc) (recognizing that the Confrontation Clause may provide greater rights in cases tried before juries than in bench trials).
A distinction between judge and jury when it comes to confrontation in capital sentencing may be justified by "the law’s traditional view that a jury cannot be trusted to make a final determination affecting substantial rights on the basis of the uncross-examined statements of out-of-court declarants.” Confrontation at Capital Sentencing Hearings, supra, at 124-25. This skepticism did not extend to judges, who could discount the probative value of hearsay evidence and traditionally admitted it only "for what it’s worth.” See Kenneth Culp Davis, Hearsay in Nonjury Cases, 83 Harv. L.Rev. 1362, 1264-65 (1970).

. While courts routinely avoid this obvious unfairness by allowing cross-examination of witnesses that do appear, the unfairness of using testimonial hearsay to establish death-worthiness, while perhaps less apparent, is no less real. With life or death on the line, the Government can now avoid defense cross-examination with the expedient of using out-of-court testimony.

. 428 U.S. 153, 203-04, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (plurality opinion).

. The majority relies on Gardner’s posture as a due process case — as it relied on the posture of Williams and Specht — to insinuate that due process is the appropriate avenue for raising these challenges. But just because the Court found that Due Process Clause protections were violated does not foreclose the possibility that other rights were violated as well. Moreover, since the Court recognized that Williams's holding directly foreclosed the application of the rules of evidence at sentencing, 430 U.S. at 355, 97 S.Ct. 1197, it is hardly surprising that the Court would not apply the Confrontation Clause at a time when it was swallowed up by evidentiary rules. Had the Confrontation Clause been given force independent of those rules — as it has today — one might expect that Gardner could have been a Sixth Amendment case.

. The Court in Davis made clear that it was not marking the outer bounds of testimonial statements or even of the subcategory of statements made in response to police interrogation. See 126 S.Ct. at 2274 n. 1.

. The Hammon case was decided jointly with Davis in a single opinion. Discussions of either case are referenced with a citation to Davis, the lead-captioned case.

. The Government does not argue that the statements were nontestimonial.

. “Pretrial examinations became routine under two statutes passed during the reign of Queen Mary in the 16th century. These Marian bail and committal statutes required justices of the peace to examine suspects and witnesses in felony cases and to certify the results to the court.... Whatever the original purpose ..., they came to be used as evidence in some cases....” Crawford, 541 U.S. at 43, 124 S.Ct. 1354 (internal citations omitted).

. See, e.g., Sub-parts B. & C., infra.

. Fields also argues that his confrontation rights were violated by the Government’s introduction of Fields's (1) McLennan County Jail records, (2) Federal Medical Center records, (3) juvenile delinquency file, and (4) Texas Department of Criminal Justice records. These documents contained unfavorable statements from probation officers, corrections officers, psychologists, and other declarants who did not testify at Fields’s tri *381 al. In all, the exhibits contain hundreds of pages, which Fields argues are "replete with hearsay statements.”
There is no need to evaluate Fields's claims, because the unconfronted testimony he has already shown would be enough to warrant resentencing. But certainly these additional claims — which the district court never evaluated because it found the Confrontation Clause did not apply — are cause for additional concern.